Slip Op. 00-103

# UNITED STATES COURT OF INTERNATIONAL TRADE

## HONORABLE GREGORY W. CARMAN

| | |
|---|---|
| **FORD MOTOR COMPANY,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : **Court No. 92-03-00164** |
| | : |
| **UNITED STATES,** | : |
| | : |
| **Defendant.** | : |

Plaintiff, Ford Motor Company (Ford), challenges the U.S. Customs Service's (Customs) assessment of duties at the rate of twenty-five percent *ad valorem* on eleven entries of foreign engines and transmissions imported and installed in trucks by plaintiff in a Foreign Trade Subzone. Plaintiff seeks to recover $5,000,000 in allegedly excess duties paid to Customs, asserting clerical errors committed by plaintiff's employee in designating the status of the entries at issue as "Non-Privileged Foreign" instead of "Privileged Domestic" and in failing to pay timely the required duties owed caused plaintiff to pay more duties than were actually due. Plaintiff also asserts Customs abused its discretion by extending liquidation of the eleven entries at issue in this case on three separate occasions pursuant to 19 U.S.C. § 1504(b)(1) (1982), and, therefore, the eleven entries should be deemed liquidated by operation of law, "as entered," one year after the dates of entry. Alternatively, plaintiff maintains the entries should be deemed liquidated after the first extension expired, or, alternatively, after the second extension expired. Defendant, United States, maintains plaintiff's failure to designate appropriately the status of the entries at issue and to pay timely the required duties owed are not remediable as "clerical errors," and Customs did not abuse its discretion in extending the liquidations.

The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) vacated this Court's grant of defendant's motion for summary judgment and remanded the case for further proceedings because the Federal Circuit found genuine issues of material fact prevented a determination on summary judgment of whether Customs abused its discretion in extending the time for liquidation and whether Ford committed correctable "clerical error." A bench trial followed.

*Held*: Customs did not abuse its discretion in extending liquidation on three separate occasions pursuant to 19 U.S.C. § 1504(b)(1), and, therefore, the eleven entries at issue are not deemed liquidated by law, "as entered." Further, plaintiff's failure to designate appropriately the status of the entries and to pay timely required duties owed are not "clerical errors" remediable under 19 U.S.C. § 1520(c)(1) (1982). Therefore, judgment is entered for the defendant.

Dated: August 21, 2000

*Coudert Brothers* (*Steven H. Becker, Paul A. Horowitz,* and *Scott D. Shauf*), New York, N.Y.; *Stein Shostak Shostak & O'Hara* (*S. Richard Shostak*), Los Angeles, CA; *Ford Motor Company* (*C. Harry Gibson*), Dearborn, MI, for plaintiff.

*David W. Ogden*, Assistant Attorney General of the United States; *Joseph I. Liebman*, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Amy M. Rubin*); *Sheryl A. French*, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of Counsel, for defendant.

**OPINION**

**CARMAN, CHIEF JUDGE:**  Plaintiff, Ford Motor Company (Ford), challenges the U.S. Customs Service's (Customs) assessment of duties at the rate of 25% *ad valorem* on eleven entries of foreign engines and transmissions imported and installed in trucks by plaintiff in a Foreign Trade Subzone (FTSZ) in Louisville, Kentucky.  Plaintiff seeks to recover $5,000,000 in allegedly excess duties paid to Customs, asserting clerical errors committed by plaintiff's employee in designating the status of the entries at issue as "Non-Privileged Foreign" (NPF) instead of "Privileged Domestic" (PD) and in failing to pay timely required duties owed caused plaintiff to pay more duties than were actually due.  Plaintiff also asserts Customs abused its discretion in extending liquidation of the eleven entries at issue in this case on three separate occasions pursuant to 19 U.S.C. § 1504(b)(1) (1982), and, therefore, the eleven entries should be deemed liquidated by operation of law, "as entered," one year after the dates of entry. Alternatively, plaintiff maintains the entries should be deemed liquidated after the first extension expired, or, alternatively, after the second extension expired.  Defendant, United States, maintains plaintiff's failure to designate appropriately the status of the entries at issue and to pay timely the required duties owed are not remediable as "clerical errors," and Customs did not

abuse its discretion in extending the liquidations.


This case comes before this Court on remand from the U.S. Court of Appeals for the

Federal Circuit (Federal Circuit). *See Ford Motor Co. v. United States*, 157 F.3d 849 (Fed. Cir.

1998) (*Ford II*). The Federal Circuit vacated this Court's grant of defendant's summary

judgment motion and remanded the case for further proceedings because it found genuine issues

of material fact prevented a determination on summary judgment of whether Customs abused its

discretion in extending the time for liquidation and whether Ford committed correctable "clerical

errors."[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988).


I. BACKGROUND[2]

A.      *Louisville Foreign Trade Subzone*

In the early 1980s, Ford applied to establish a Foreign Trade Subzone at its Louisville,

---

[1] This Court notes the Federal Circuit in its opinion remanding this case for trial stated, "Customs has questioned whether Ford's record keeping system was adequate. Ford argues that Customs did not timely raise the issue below, but the trial court declined to address it. This court leaves it to the trial court on remand to pass on the relevance and timeliness of this point." *Ford Motor Co. v. United States*, 157 F.3d 849, 863 n.5 (Fed. Cir. 1998) (*Ford II*) (citations omitted). The parties agreed in the Pretrial Order signed by all parties on January 26, 2000, that the only two issues before this Court on remand are (1) whether Customs abused its discretion by extending the time for liquidation of the subject imports pursuant to 19 U.S.C. § 1504(b) (1982) on three separate occasions; and (2) whether the failure of Ford's employee to check the status designation box on Customs Forms 214 and deposit duties on the subject engines and transmissions constituted clerical errors which are correctable under 19 U.S.C. § 1520(c)(1) (1982). (*See* Pretrial Order, Sched. F-1.) Thus, this Court does not consider the adequacy of Ford's record keeping system on remand. For the reasons stated above, this Court also does not consider whether the errors qualify as "inadvertence." *Ford II*, 157 F.3d at 861.

[2] The facts cited in this section are based largely on the statements of uncontested facts filed with this Court as Schedule C attached to the Pretrial Order. (*See* Pretrial Order, Sched. C.)

Kentucky assembly plant which manufactured cars (Bronco IIs) and trucks (Rangers). Ford

informed Customs that it intended to use the FTSZ to assemble imported engines and

transmissions into cars and trucks. Ford's rationale for establishing the FTSZ was to take

advantage of Customs's laws and regulations that would enable Ford to minimize the duties paid

on imported engines and transmissions assembled into cars and trucks. A FTSZ, though located

in the United States, receives treatment under Customs's laws as a territory outside of the United

States. *See generally* 15 C.F.R. § 400.1(c) (1992). At a FTSZ, an importer has the "choice of

paying duties either at the rate applicable to the foreign material in its condition as admitted into

a zone, or if used in manufacturing or processing, to the emerging product." *Id.* During the

relevant times for this case, the duty rate for a completed car was only 2.6% *ad valorem*. The

duty rate for imported engines and transmissions was 3.3% *ad valorem*. The duty rate for

completed trucks was much higher—25% *ad valorem*. Thus, by locating its Louisville plant in a

FTSZ, Ford could pay the duty rate of 2.6% *ad valorem* (for completed cars) on the imported

engines and transmissions for cars and could continue to pay the duty rate of 3.3% *ad valorem* on

the imported engines and transmissions for trucks.


        To qualify for FTSZ treatment, the regulations required Ford to conduct its operations in

a specific manner. To take advantage of the lower rate applicable to completed cars, Ford had to

select "Non-Privileged Foreign" status on a Customs Form 214 (CF 214) when the engines and

transmissions to be assembled into cars entered the FTSZ. When NPF status was selected for the

engines and transmissions for cars, Ford could defer payment of duties on the car parts until it

had assembled them into completed cars and thereby capture the rate for completed cars, rather

than for car parts. On the other hand, because the duty rate applicable to completed trucks was

substantially higher than the duty rate applicable to engines and transmissions for trucks which entered as parts, to take advantage of the lower duty rate applicable to engines and transmissions for trucks, Ford had to select "Privileged Domestic" status on a CF 214 when the parts destined for use in trucks entered the FTSZ.  By selecting PD status, Ford was to pay the lower component duty rate before the engines and transmissions entered the FTSZ and, thus, reduce the duties paid on finished trucks.  For either of these two designations, payment needed to accompany Customs Form 7501 (CF 7501), which identifies merchandise entering the commerce of the United States.  Thus, to successfully operate the FTSZ, Ford had to identify each part entering the FTSZ as either a car part or a truck part, and then, based on that identification, select the correct FTSZ status and pay duty at the appropriate time and rate.

Ford appointed Elma D. (Moe) Tullock, one of Ford's traffic expediters (also known as parts chasers), to be the Louisville FTSZ Coordinator (also referred to as the FTSZ Agent and/or FTSZ Representative).  As part of his duties as the FTSZ Coordinator, Tullock was responsible for completing the Customs's forms necessary for the daily operations of the FTSZ.

B.       *Entries Made Between December 1985 and February 1986*

Ford's Louisville FTSZ operated for less than three months.  In the beginning of January 1986, Tullock began to experience difficulty handling certain Customs aspects of the Louisville FTSZ.  From December 30, 1985, to February 7, 1986, Ford incorrectly entered NPF-designated engines and transmissions contained in completed trucks at the parts rate instead of the rate applicable to completed trucks.  For the entries at issue, Tullock checked the NPF box on all the CF 214s and paid no duty up front.  Tullock described each entering part as "transmissions for

trucks," "transmissions for autos," "engines for trucks," or "engines for autos." Each Customs's form set forth a 2.6% rate for the car parts and a 3.3% rate for the truck parts. The eleven entries were replete with errors. Product descriptions, duty rates, and tariff item numbers were incorrect. In mid-February 1986, Ford ceased operations of the FTSZ. In that time, only the subject eleven entries were entered from the Louisville FTSZ into the commerce of the United States.

At some point in late January or early February 1986, Ford met with Customs Import Specialist Richard McNally in Ohio and disclosed the errors made. Ford representatives requested that McNally permit Ford to change the zone status of the truck parts to PD. In June 1986, McNally informed Ford that he could not change the zone status of the truck parts.

In June or July 1986, McNally re-computed the duties due by changing the duty rate applicable to the engines and transmissions in trucks, which had been entered at a 3.3% *ad valorem* rate, to the truck rate of 25% *ad valorem*. In July 1986, McNally prepared an Importer's Premises Visit-Significant Importation Report. During the same month, McNally also prepared a Memorandum of Information Received for the Customs Office of Enforcement/Investigation. Customs began a civil fraud investigation of the entries at issue under 19 U.S.C. § 1592 (1982) in August 1986. The investigation continued through at least March 1990.

C.      *Customs's Extensions and Liquidations and Ford's Protest*

The eleven entries at issue were liquidated on December 1, 1989, after three one-year

extensions[3] at the 25% duty rate for finished trucks.[4]  In response to plaintiff's interrogatories,

defendant stated the basis for the issuance of the three successive one-year extensions was that

"'there was an ongoing investigation regarding an alleged violation under 19 U.S.C. § 1592.'"

(Pretrial Order, Sched. C, Undisputed Facts, ¶ 48.)  Defendant also advised in response to

plaintiff's interrogatories there were two outstanding appraisement and classification issues: (1) a

memorandum from Customs Headquarters requested that liquidation of entries containing Tariff

Schedules of the United States (TSUS) 807.00 claims from all Ford FTSZ which received

electrical products manufactured in a certain location be extended[5]; and (2) Customs was

concerned specifically that Ford had improperly classified cars as trucks.

The final additional duty assessed on the eleven entries was more than $5,000,000.  Two

of the eleven entries were reliquidated in February 1990 to make technical corrections.  In the

liquidations, Customs accepted Ford's 807.00 claims.  Ford timely protested the liquidations and

paid the additional duties assessed.

With this background in place, the Court now turns to the parties' contentions and the

---

[3]  The parties stipulated at trial that the extensions at issue occurred on or about October 22, 1986, mid-to-late October 1987, and on or about October 18, 1988. *See* Trial Transcript (Trial Tr.) at 776-77.

[4]  In *Ford Motor Co. v. United States*, 979 F. Supp. 874 (CIT 1997) (*Ford I*), Ford challenged whether Customs had actually sent the notices of extension to Ford as required under 19 U.S.C. § 1504(c) (1982).  This Court granted summary judgment in favor of Customs. *See Ford I*, 979 F. Supp. at 886-90.  Ford did not contest this ruling on appeal. *See Ford II*, 157 F.3d at 854 n.3.  Therefore, this issue is not before this Court on remand.

[5]  Four of the eleven entries at issue in this case claimed treatment under Item 807 of the Tariff Schedules of the United States (TSUS) (American goods returned).

Court's discussion of the issues. The factual determinations appearing in the discussion section constitute findings of fact by the Court but have been deferred in order to achieve an orderly presentation of the issues.

## II.  CONTENTIONS OF THE PARTIES

A.      *Plaintiff*

Ford argues the eleven entries at issue should be deemed liquidated by operation of law, "as entered," one year after the dates of entry pursuant to 19 U.S.C. § 1504(a) (1982) because Customs did not have a valid basis for extending liquidation under 19 U.S.C. § 1504(b)(1). Alternatively, Ford maintains, at the very least, the entries should be deemed liquidated after the first extension expired, or, in the alternative, after the second extension expired.

Specifically, Ford argues Customs failed to show "information needed for the proper appraisement or classification of the merchandise [was] not available to the appropriate customs officer," as required by subsection (b)(1) of 19 U.S.C. § 1504, the statutory basis upon which Customs relies in granting the three extensions. Ford contends no evidence adduced at trial shows McNally needed more information for appraisement or classification of the entries at issue.[6] First, Ford contends, McNally's Significant Importation Report dated July 1986 indicates McNally had the eleven entries in his possession and correspondence and documents from Ford.

---

[6]  At trial, Ford produced six witnesses:  Richard McNally, George F. Fritz, Jr., Charles David Kyle, Jr., William Kuchenbrod, Allen Moody, and Elma D. (Moe) Tullock.  The government produced three additional witnesses:  Robert J. Cortesi, Hilton B. (Bernie) Duckworth, and Clinton Littlefield.  In addition, both parties introduced excerpts from the deposition of the late Lars Anderson.

Further, McNally testified at trial he could not recall requesting additional documents or information from Ford or Customs.

Second, Ford contends when asked at his deposition in 1994 whether he expected additional classification and value information after his July 1986 report, McNally stated he could not remember but that he must have needed more information because he did not liquidate the entries. Ford points out, as did the Federal Circuit, that such reasoning is circular and does not help Customs show it acted reasonably. *See Ford II*, 157 F.3d at 856.

Third, although McNally stated at trial he referred the matter to the Office of Enforcement for "more information" and because of the amount of duty involved, Ford contends the Significant Importation Report, which indicates why McNally referred the matter, is silent as to any need for information. When asked at trial, McNally could not recall the reason for the referral. Moreover, Customs Special Agent George F. Fritz, Jr., who reviewed the Memorandum of Information Received with McNally, testified he understood the Memorandum to be a request for the office to investigate whether there was any culpability on Ford's part.

Further, even though McNally stated one of the reasons he did not liquidate the entries was because it was the policy of Customs to withhold liquidations on entries under referral, McNally could not recall any other reasons for extending the liquidation. Ford argues any presumption of correctness that attaches to the actions of Customs officers under 28 U.S.C. § 2639(a)(1) (1994) is defeated by McNally's own testimony. Further, Ford contends, defendant's argument that McNally had many concerns about the entries does not help because there is no

evidence that the concerns translated into information needed for classification or appraisal.

Moreover, according to Ford, the two Customs agents who conducted the § 1592 investigation confirmed McNally neither sought nor expected information needed to classify or appraise the merchandise at issue as both Special Agent Fritz and Special Agent Charles David Kyle, Jr. testified that McNally never asked them to obtain any information or documentation. Additionally, although Hilton B. Duckworth, the Cincinnati Port Director and McNally's supervisor, testified as to his recollection of additional reasons liquidation was extended, including to verify the accuracy of information in McNally's possession, Duckworth testified that he was not involved in making the decision to extend liquidation and any involvement he might have had in approving the decision likely occurred after the decision was made. Ford also asserts no testimony at trial states how the desire to "verify" information translates into a need for more information. Moreover, Ford asserts the evidence shows Duckworth could not recall any instance in which McNally ever told Duckworth that he needed additional information from the agents or indicated he expected to receive such information. According to Ford, McNally's silence to his supervisor belies any presumption he needed information.

Ford also contends Clinton Littlefield's, the Assistant District Director for Commercial Operations in Cleveland, citation of a pending 807 audit fails to support the reasonableness of the extensions. As the audit only covered four of the eleven entries and as it was concerned with possible commingling of U.S. and foreign parts assembled into radios entered by Ford Electronics & Refrigeration Corporation (FERCO) in Landsdale, Pennsylvania, the 807 audit could not affect the liquidation of the Louisville entries in this case.

Ford contends the primary reason given by McNally for extending the liquidations—because it was the policy of Customs to withhold liquidation while a § 1592 investigation was pending—also fails to satisfy the statutory requirement. Ford argues to satisfy the statutory standard, Customs must establish, in accordance with the Federal Circuit in *Ford II*, that the investigation was "reasonably expected to produce information about 'appraisement' and 'classification.'" *Ford II*, 157 F.3d at 856. Ford argues a "reasonable expectation" requires proof of both a subjective reasonable expectation as well as an objective reasonable expectation. Thus, Ford contends, McNally must have had both a subjective expectation that the fraud investigation would produce information needed for classification or appraisement and that expectation must have been objectively reasonable. Ford argues, however, that McNally did not tell his supervisor that he needed information, nor did he seek or request information of any kind from the agents. Thus, according to Ford, McNally's own conduct demonstrates he had no "expectation" that the investigation would produce classification or appraisement information. Though Ford acknowledges McNally admitted that with regard to any investigation one cannot know with certainty what the investigation will uncover, Ford contends the issue is not a theoretical question but rather a practical one—whether McNally himself had a reasonable expectation. Ford asserts the evidence at trial does not demonstrate such an expectation.

Additionally, Ford argues, even if the Court were to find Customs needed additional information and initially had reason to expect that the § 1592 investigation would produce information needed for appraisement or classification of the merchandise at issue, the extensions—particularly the second and third extensions—cannot be sustained because Customs took an unreasonable amount of time to seek and process the information and complete the

investigation.  Specifically, Ford contends the evidence at trial demonstrates there were long stretches of time in which no work was performed on the Ford matter.  First, Ford points to evidence concerning the length of the fraud investigation which began in August 1986 and lasted at least through March 1990.  During the first few months, from August 1986 to November 1987, the case was assigned to Special Agent Fritz.  While there was activity on the case from August 1986 through March 1987, Fritz admits there was no work performed on the case from March until the case was reassigned on November 19, 1987.  Thus, the case remained idle for seven and one-half months before the second extension in October 1987.  Moreover, though Fritz was assigned to the Cincinnati Airport for thirty days in the fall of 1986, opened the Bowling Green office for thirty days during the summer of 1987, and was on sick leave for in November 1987, no evidence explains adequately Fritz's neglect of the file from March through November.  The neglect, Ford contends, does not justify the 1987 extension.

Once the file was transferred to Special Agent Kyle and after Kyle reviewed the file in early 1988, Kyle testified all that needed to be done was for McNally to determine the appropriate rate of duty and provide Kyle with that information.  Though Kyle testified he had a heavy workload at the time, Ford points out he stated it was not his workload which impeded him.  Kyle testified that for some seven or eight months in 1988 McNally did no work on the Ford matter.  Moreover, Ford contends, notes from a February 21, 1989, meeting show McNally had not calculated the duty loss.  McNally was supposed to rectify discrepancies in figures on various documents but had known about these needs for several years.  Ford contends McNally did not provide an explanation at trial on why it took him so long to rectify the discrepancies.  Kyle even took the unusual step, Ford argues, of writing McNally to request the information after

months of delay. Thus, according to Ford, as no explanation was provided regarding why it took McNally three years to rectify such discrepancies, Customs should not be permitted to justify the October 1988 extension.

Ford also argues McNally's delay was not justified with regard to any 807 issues. According to Ford, evidence showed that in January 1986 Tullock sent McNally information concerning 807.00 values of imported engines and transmissions. At a meeting in February 1987, McNally's notes indicate 807 information was on file and that McNally would send a request for further information regarding 807 if necessary. No such request was sent by McNally. The unreasonableness of McNally's failure over a two year period to request additional 807 information is, according to Ford, confirmed when in late 1989 based on the same information he had in February 1987, McNally concluded there was no 807 problem. Thus, Ford argues, Customs should not be permitted to justify the extensions on the grounds that the investigation was continuing or that necessary information had not been reviewed.

Ford additionally argues the evidence adduced at trial establishes that, despite being properly trained and supervised, Tullock failed to follow clear, complete, and binding instructions, and thus committed correctable "clerical errors" under 19 U.S.C. § 1520(c)(1) (1982). Ford contends a subordinate commits clerical error when he "'is given binding instructions *on particular aspects of a task*, no duty devolves upon him to exercise discretion or judgment *in carrying out those aspects*,'" and he "acts contrary to those instructions." (Pl.'s Post-Tr. Br. at 25 (quoting *Ford II*, 157 F.3d at 860).) Ford argues the record firmly establishes Tullock was given clear, complete, and binding instructions to designate truck parts as PD and to

pay duty on those parts before they entered the FTSZ and to designate car parts as NPF and to pay duty on those parts as the assembled cars exited the zone. Instructions were provided in writing (*e.g.*, Ford's FTSZ manual and other materials Tullock received) and orally and were reviewed with Tullock by Lars Anderson, Ford Headquarter's staff person who coordinated the FTSZ program. Ford cites Tullock's contemporaneous memorandum dated January 17, 1985, as proof Tullock received and understood those instructions. Ford also cites Tullock's testimony at trial that he communicated his understanding of the instructions to Anderson verbally as proof that he understood them. Although some truck and car parts at the plant were interchangeable, Ford argues this issue is irrelevant, as Ford Headquarters predetermined the destination of all parts when it created the daily material records report. Thus, all Tullock had to do was to follow the instructions and designate the parts destined for trucks as PD and pay duty up front and designate the parts destined for cars as NPF and pay duty when the assembled cars exited the zone.

Ford additionally argues Tullock had no discretion to deviate from the clear, binding instructions. For example, Ford argues Tullock had no discretion regarding the designation of zone status, the payment of duties on car and truck parts, the determination of NPF or PD status, the determination of how to make an entry, or the determination of which engine or transmission went into cars or trucks. As Tullock was given binding instructions regarding the designation of zone status and the timing of payments, no duty devolved on him to exercise original thought or judgment in assigning import status to truck parts or in determining when to make payments. As Tullock acted contrary to the binding instructions, his errors in designating truck parts PD and in failing to pay timely the duty on those parts were "clerical errors."

Ford argues Tullock was also well-trained. According to Ford, the record establishes Anderson was in frequent contact with Tullock. Tullock visited other FTSZs, such as the FTSZs in Wayne, Michigan and Wixom, Ohio and saw first-hand how they operated. Further, Ford points out, Anderson reviewed documents with Tullock and visited Tullock in Louisville on numerous occasions. Tullock could contact Anderson or Moody, Supervisor of Ford's Customs Department and overseer of the FTSZ, at any time with questions. Ford argues no special training was necessary, as the government contends, regarding how Tullock needed to handle interchangeable parts as Ford Headquarters predetermined how many parts were needed for what vehicles, and Tullock had no authority to deviate from those determinations. Thus, Ford argues, the record demonstrates Tullock was adequately trained.

Ford also asserts Tullock was well-supervised. Ford points to the evidence at trial that Anderson was in frequent contact with Tullock, thereby making the fact that William Kuchenbrod, Tullock's parts chaser supervisor, was not trained in FTSZ matters irrelevant. Further, Ford contends, Anderson met with Tullock at Ford Headquarters and visited Tullock at the Louisville plant. Thus, according to Ford, Tullock was also well-supervised. Applying these facts to the legal standard for "clerical error" as enunciated by the Federal Circuit, Ford argues, the only conclusion is that Tullock's errors constituted "clerical errors" under the statute.

B.     *Defendant*

Defendant argues evidence at trial shows Customs, in its discretion, determined to extend liquidation of the eleven entries at issue while it waited for further information it believed necessary to ensure the correct classification and appraisement of the imported merchandise at

issue. In order for Ford to prove Customs abused its discretion, the government argues, Ford

must eliminate "'all possible grounds'" for the three extensions and establish that the relevant

Customs officials extended the liquidations "'with actual knowledge that no basis exist[ed] for so

doing.'" (Def.'s Pre-Tr. Br. at 4 (quoting *St. Paul Fire & Marine Ins. Co. v. United States*, 6

F.3d 763, 768 (Fed. Cir. 1993)).) The government argues Ford has not met this burden.

The government further contends it is entitled to rely on a presumption of regularity that

the import specialist properly performed his duties, and the government is entitled to a statutory

presumption that Customs's decisions to extend liquidation were correct. The burden of proving

otherwise is on Ford. These presumptions, the government asserts, are not defeated by a

Customs officer's failure to recall specific information, as Ford appears to claim in its papers.

The government argues McNally was waiting for information he reasonably believed

could affect the classification or appraisement of the merchandise. McNally testified he did not

remember specific details regarding the entries, but he authenticated the content of documents he

wrote or signed. The documents he authenticated, the government contends, indicate a number

of concerns McNally had regarding the entries related to the classification or appraisement of the

merchandise at issue. The government asserts evidence at trial shows areas of concern included,

but were not limited to:

> how the FTZ was set up, what articles entered and left the FTSZ, the proper tariff
> provisions for the merchandise leaving the zone, the method used by Ford to account for
> controlled merchandise in the zone, calculation errors on the entry papers, Ford's "807"
> claims on some of the entries, the basis for the selection of "NPF" status . . . why
> completed vehicles were entered as parts, and the amount of duty loss attributable to
> these entries.

(Def.'s Post-Tr. Br. at 4.)  Accordingly, further information was needed from Ford for the proper classification or appraisement of the merchandise at issue.

The government attempts to refute Ford's argument that because the Memorandum of Information Received and Significant Importation Report state the matter was referred for investigation because a lot of duty was at stake, the matter could not have been referred because of a need for additional classification or appraisement information.  The government argues several witnesses testified that the documents were not comprehensive.  Moreover, the government argues, evidence at trial demonstrates that a significant potential loss of revenue arising because of apparent substantive errors would "be a signal that something is amiss with the information provided for purposes of classifying and/or appraising the entered merchandise." (Def.'s Reply to Pl.'s Post-Tr. Br. at 3.)

The government also disputes Ford's characterization of McNally's lack of recollection regarding asking for information from Fritz or Kyle.  According to the government, Fritz stated he did not recall any request for specific information by McNally, and Kyle stated to the best of his knowledge, McNally was not waiting for information.  The government essentially argues Ford's characterizations of the testimony are misleading.

The government also asserts Ford's circularity argument is without merit.  Ford introduced at trial evidence of deposition testimony of McNally wherein he testified although he could not remember any specific information he was waiting for after he referred the matter to investigation, he must have been waiting for additional information because he referred the

matter for investigation, and the entries were not liquidated. The government contends Ford's

focus on this aspect of McNally's testimony is misplaced. Although the government admits that

at first blush such reasoning may appear circular, it is, in effect, logical. As McNally had been an

import specialist for thirty years, the government argues, "it would be inconceivable that [he] did

not know the existing statutory bases for extending liquidations." (Def.'s Post-Tr. Br. at 4.)

Thus, McNally's statement that he must have needed more information by virtue of the fact that

the liquidations were extended was merely shorthand for indicating that for as much as he knew

the statutory requirements for extending liquidation, the fact that he had extended the liquidations

necessarily meant he needed additional information.

The government argues the testimony of Duckworth supports the assertion that the entries

remained unliquidated until 1989 because McNally needed more information. The government

points to testimony by Duckworth that he required import specialists under his supervision to

justify why significant entries remained unliquidated following an anniversary date. Although

some of the entries reviewed were immediately liquidated, the remaining entries were those for

which the import specialists determined more information was needed. The government

contends Duckworth's signature on the referral memorandum indicates he concurred in the

decision to refer the entries for investigation knowing that liquidation could be extended only if

Customs needed more information to classify or appraise the merchandise properly.

The government also contends although McNally extended liquidation in part because it

was Customs's policy to withhold liquidations while a § 1592 investigation was pending,

Customs anticipated information could be disclosed regarding the classification or appraisement

of the entries at issue as a result of the investigation.[7]  For example, the government points to,

among other evidence, McNally's testimony at trial that the estimated duties he derived in 1986

could have been changed based on information he might have received prior to liquidation as a

result of the investigation.

The government also points to Duckworth's recollection that the entries were extended to

verify information needed to classify correctly the merchandise in light of possible fraud and

withholding of duties.  Although Duckworth testified he could not recall anything about the

valuation of the merchandise that would call into question McNally's July 1986 estimated loss of

revenue calculation, the government points to Duckworth's testimony that potential fraud in any

investigation calls into question all aspects of the importation—including the veracity of the

information provided to Customs for use in classifying and appraising the merchandise.  Thus,

McNally appropriately withheld liquidation pending results of the investigation.

That McNally ultimately had to liquidate without the benefit of the results of the

investigation, the government contends, does not negate the reasonableness of awaiting those

results.  The government asserts the actual information obtained in the course of an investigation

and whether that information would affect the merchandise at issue regarding its classification or

appraisement cannot be known until the investigation is complete.

---

[7] The government states in its pre-trial brief that internal information, like that sought by Customs in the fraud investigation, "satisfies the requirement of section 1504(b)(1)."  (Def.'s Pretr. Br. at 6 (citing *A Classic Time v. United States*, 942 F. Supp. 589 (CIT 1996) (citing *Detroit Zoological Soc'y v. United States*, 10 CIT 133, 138, 630 F. Supp. 1350, 1356-57 (1986))).)  Thus, the government argues, seeking internal information of this kind satisfies section 1504(b)(1).

Thus, the government contends, Ford was unable at trial to meet its burden of proof and adduce sufficient evidence to eliminate all possible grounds for the three extensions. As the investigation involved the classification or appraisement of the imported merchandise and the appropriate Customs official was awaiting information resulting from that investigation, so long as the investigation continued, Customs had a reasonable basis for extending the liquidation periods. Thus, according to the government, Ford cannot demonstrate it is entitled to relief.

Additionally, the government argues, the manner in which the investigation was conducted and the total amount of time consumed were reasonable under the circumstances. Although Special Agent George Fritz, the special agent initially assigned to investigate the Ford entries, undertook investigative activities from the beginning of the investigation in August 1986 through March 1987, Fritz admitted at trial that he did not undertake any additional significant activities on the Ford case between March 4, 1987, and November 19, 1987. The government points out, however, that Fritz explained he had other priorities during that time, including other investigations. Moreover, the government points to Fritz's testimony that when the file was ultimately transferred to the Bowling Green office in November 1987, there was more work to be done on the investigation, including interviewing Ford and Customs personnel.

Additionally, the government cites testimony of Special Agent Kyle, to whom the case was reassigned in the Bowling Green office,[8] which shows as head of the new office, Kyle had

---

[8] Robert J. Cortesi, the Resident Agent In Charge at U.S. Customs in Cincinnati, Ohio, testified that the case was reassigned to Kyle in mid-investigation because when the Bowling Green office opened, all investigations that were based in the Western Federal Judicial District of Kentucky were referred to the jurisdiction of the Bowling Green office. *See* Trial Tr. at 732-33.

responsibility for acquiring new furniture, equipment, and personnel in addition to his normal duties as a special agent. Kyle testified these additional tasks took from one to two years to complete. Kyle further testified it took several months for him to familiarize himself with the Ford file which Kyle confirmed required additional personnel be interviewed to complete the investigation. Although Kyle testified he began having trouble completing his investigation in 1988 because he had not received information from McNally, the government asserts Kyle never formalized or forwarded his requests in writing until after a meeting held on February 21, 1989. Thus, the government notes, there is no indication that any request had been made prior to the February 21 meeting. Under the circumstances, the government contends, the amount of time consumed for the investigation was reasonable.

The reasonableness of the duration of the investigation from the time it was reassigned to Kyle, the government asserts, was reinforced by testimony of Robert Cortesi, the Resident In Charge at U.S. Customs in Cincinnati, Ohio. Cortesi testified that the time gaps between the listed activities in his review reports of Kyle's investigation of the Ford entries were reasonable because the activity in any given case depends on a number of factors, including the activity of the office and other responsibilities of the assigned agent. As part of the time Kyle conducted the Ford investigation was devoted to setting up the Bowling Green office and given the amount of information that had to be reviewed and analyzed in this case, Cortesi confirmed the amount of time consumed by the investigation was reasonable. Thus, the government argues, "Ford has not demonstrated that the amount of time consumed was unreasonable or that the investigation could have or should have concluded sooner." (Def.'s Reply to Pl.'s Post-Tr. Br. at 7.)

Additionally, the government contends Ford's failure to designate the imported parts as PD and to deposit duties before the merchandise entered the Louisville FTSZ do not constitute correctable "clerical errors" under 19 U.S.C. § 1520(c)(1). According to the government, a clerical error is a "'mistake made by a clerk or other subordinate, upon whom devolves no duty to exercise judgment in writing or copying the figures or in exercising his intention.'" (Def.'s Pretr. Br. at 12 (quoting *PPG Indus., Inc. v. United States*, 7 CIT 118, 124 (1984)).) The government asserts, however, that evidence at trial shows that as the FTSZ Coordinator, Tullock held a position that required him to assume significant responsibilities and exercise considerable judgment in performing those duties. For example, as FTSZ Coordinator, Tullock was involved in establishing the FTSZ and was charged with handling the paperwork relating to the parts to be "controlled" within the zone.

Moreover, the government asserts, the evidence at trial demonstrates Tullock was not well-trained or well-supervised. Regarding training, the government points to evidence at trial that the list of parts to be controlled identified in a memorandum entitled "Status of Louisville Assembly Plant as a Foreign Trade Zone," dated January 17, 1985, from Tullock to William Kuchenbrod, Tullock's parts control supervisor, indicates all seven parts identified in the memorandum could be used for either cars or trucks. However, the memorandum "does not indicate how these interchangeable parts were to be divided between Bronco II parts and Ranger parts before entering the zone." (Def.'s Post-Tr. Br. at 22.) Nor was there any mention of NPF or PD or "how Tullock would cause the parts to be designated as either 'PD' or 'NPF.'" (*Id.*) Kuchenbrod testified, however, that as far as he knew, engines and transmissions for Bronco IIs were not segregated from engines and transmissions for Rangers when they entered the plant.

Thus, there would be no way of knowing which type of vehicle the part would ultimately end up in because, prior to production, no one kept track. Thus, the government argues, Kuchenbrod's testimony does not support that Ford adequately trained Tullock.

Testimony from Moody, the government argues, further fails to demonstrate that Ford adequately trained Tullock. First, Moody acknowledged at trial that he was not aware that some of the parts to be controlled in the FTSZ were interchangeable and that had he known, he would have removed any common usage parts from the program.[9] Further, Moody testified that in setting up the FTSZ at Louisville, Tullock visited other FTSZ that were already operating. Tullock was expected to copy the inventory and record keeping systems of the other plants. The government notes, however, that none of these plants had to control common usage parts. Thus, the training Tullock received was not adequate for the unique features at the Louisville FTSZ. Additionally, the only written material provided to Tullock was Ford's FTSZ manual. The government points out, however, that the manual was used for all of Ford's FTSZs and was not specific to the Louisville plant. Indeed, the government asserts, the document is silent with respect to how to deal with PD merchandise. In sum, the government claims, Moody's testimony does not demonstrate that Tullock was adequately instructed and trained on how to be a FTSZ Coordinator at Louisville.

Moreover, the government contends, Tullock's own testimony at trial does not

---

[9] The government also cites to testimony by Lars Anderson indicating he, too, appeared to be unaware that at least some of the parts being controlled in the Louisville FTSZ were common to cars and trucks.

demonstrate he was instructed and trained adequately on how to be a FTSZ Coordinator. According to Tullock, he had to do the paperwork based on observations from other plants, but he was unable to do the paperwork adequately as the other plants were not operating zones with different vehicles coming down the same assembly line. Thus, there was no correlation between the zones at the plants where he received his training and the job he was actually supposed to do. Moreover, Tullock testified no one explained to him how to do the paperwork differently. Thus, the government asserts, he was not adequately trained.

Regarding supervision, the government argues, Tullock was essentially left on his own at Louisville to manage the FTSZ and prepare all applicable paperwork and was not supervised by anyone at the Louisville plant with knowledge of foreign trade zone management. Kuchenbrod, who was Tullock's only officially designated supervisor within the Ford organization, testified he "knew almost nothing about Tullock's FTZ responsibilities." (Def.'s Post-Tr. Br. at 20.) According to Kuchenbrod, Anderson and Moody, division people from Ford Headquarters, were the people to whom Tullock would turn with any problems or concerns. When Tullock told Kuchenbrod he was having trouble, Kuchenbrod would tell him to call the division people. The government points out, however, Kuchenbrod did not know whether Tullock heeded that advice, and when Kuchenbrod would ask whether Tullock received the information he needed, Tullock would sometimes say, "No." Further, Anderson testified that once the zone was established, there was no requirement that the zone had to report formally to Anderson's office. Anderson testified Kuchenbrod was Tullock's supervisor. The government points out, however, that Tullock was the only person at the Louisville plant with any knowledge regarding FTSZs. The government argues such negligence by Ford is not remediable under § 1520(c).

Thus, the government contends, Ford has not sustained its burden of demonstrating either that Customs acted unlawfully in extending liquidation of the entries at issue or that the NPF designation of and the failure to pay duties on the entries are correctable errors under the statute.

## III. DISCUSSION

A.      *Legality of the Extensions of Liquidation*

1.      *Standard of Review*

This Court reviews Customs's decisions to extend the time to liquidate under an abuse of discretion standard. *See* 5 U.S.C. § 706(2)(A) (1994); *Ford II*, 157 F.3d at 855; *St. Paul*, 6 F.3d at 768; *International Cargo & Surety Ins. Co. v. United States*, 15 CIT 541, 542, 779 F. Supp. 174, 176 (1991); *Detroit Zoological Soc'y v. United States*, 10 CIT 133, 137-38, 630 F. Supp. 1350, 1356 (1986) (decisions to extend liquidation reviewed for arbitrariness and abuse of discretion). Such an abuse of discretion "may arise only when an extension is granted even following elimination of all possible grounds for such an extension." *St. Paul*, 6 F.3d at 768. Thus, the Court cannot uphold a decision to extend the liquidation if "it can be shown that the importer . . . eliminated all reasonable bases for making that decision." *Id*. "Extending a period of liquidation with actual knowledge that no basis exists for so doing," for example, "would be an abuse of Customs' discretion." *Id*. Thus, there is "a narrow limitation on Customs' discretion to extend the period of liquidation." *Id.*

In determining whether Customs's decisions to extend liquidation are sufficiently unreasonable to constitute an abuse of discretion, "the decision[s] of [Customs] . . . [are] presumed to be correct," and the burden of proving otherwise is on the importer. 28 U.S.C.

§ 2639(a)(1); *St. Paul*, 6 F.3d at 768; *see generally Century Importers, Inc. v. United States*, 205 F.3d 1308, 1311 (Fed. Cir. 2000).  This presumption is only a procedural device which allocates the burden of producing sufficient evidence.  *See Universal Elecs., Inc. v. United States*, 112 F.3d 488, 492-93 (Fed. Cir. 1997).  *St. Paul* requires that the importer overcome the presumption of correctness by a preponderance of the evidence.  *See St. Paul*, 6 F.3d at 769.  The Federal Circuit has defined preponderance of the evidence as "'the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it.'"  *Id.* (quoting *Hale v. Department of Transp., FAA*, 772 F.2d 882, 885 (Fed. Cir. 1985)).  Further, the government is entitled to rely on a presumption of regularity, that is, "it may be presumed that the import specialist . . . properly performed [his] duties."  *Id.*; *see also* 2 KENNETH S. BROUN, ET AL., MCCORMICK ON EVIDENCE § 343, at 438-39 (John W. Strong, ed., 5th ed. 1999).

### 2.    *Legislative Scheme*

Imported merchandise not liquidated within one year of its entry into the United States "shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer . . . ."  19 U.S.C. § 1504(a).[10]  The statute provides, however,

---

[10]  Section 1504(a) provides, in pertinent part:

> (a) Liquidation
>    Except as provided in subsection (b) of this section, an entry of merchandise not liquidated within one year from:
>
>    (1) the date of entry of such merchandise;
>
> . . . .
>
> shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer . . . .

Customs may extend the period in which to liquidate an entry under three specific circumstances,

including if "information needed for the proper appraisement or classification of the merchandise

is not available to the appropriate customs officer."  19 U.S.C. § 1504(b)(1).[11]  Customs's

regulation additionally requires that any individual extension may not exceed one year.  *See* 19

C.F.R. § 159.12(a)(1) (1985).  Almost no circumstance justifies a delay in liquidation beyond

four years.  *See* 19 U.S.C. § 1504(d) (1982).


       3.       *Extension of Time to Liquidate*[12]

       Customs invokes subsection (b)(1)—"information needed for the proper appraisement or

classification of the merchandise is not available to the appropriate customs officer"—to justify

its extensions.  As Customs invokes subsection (b)(1) to justify its extensions, to prevail in this

---

19 U.S.C. § 1504(a) (1982).

   [11]  Section 1504(b) provides, in pertinent part:

           (b) Extension
               The Secretary may extend the period in which to liquidate an entry by
       giving notice of such extension to the importer . . . in such form and manner as
       the Secretary shall prescribe in regulations, if—

               (1) information needed for the proper appraisement or classification of
           the merchandise is not available to the appropriate customs officer;
               (2) liquidation is suspended as required by statute or court order; or
               (3) the importer . . . requests such extension and shows good cause
           therefor.

19 U.S.C. § 1504(b).


   [12]  The Court initially considers whether it was reasonable for Customs to extend
liquidation in the first instance.  The reasonableness of the length of the extensions will be
considered later in this opinion.

case, plaintiff must prove, pursuant to *St. Paul*, 6 F.3d at 768, that it was unreasonable for

Customs to extend liquidation on the premise that information needed for the proper

appraisement or classification of the merchandise was not available to the appropriate customs

officer.[13]  Here, plaintiff has not made a sufficient showing to meet its burden.

         a.     *Initial Extension*

The government appears to put forward principally two reasons why Customs's decisions

---

[13]  Ford appears to interpret the wording in section 1504(b)(1) to mean in order for an extension to be proper, the appropriate Customs officer, *e.g*., the import specialist who granted the extensions, personally has to need information or, in the case of an ongoing fraud investigation, personally has to have a "reasonable expectation" that the investigation will produce information about classification or appraisement.  The Court finds such an interpretation unnecessarily narrow.  The statute permits an extension if "information needed for the proper appraisement or classification of the merchandise is not available to the appropriate customs officer."  19 U.S.C. § 1504(b)(1).  While the Court agrees the appropriate Customs officer in this case is the import specialist, there is nothing in the statute which limits the need for the information to that specific officer.  Rather, the statute suggests the information needed is that which is needed by Customs generally to allow the Customs officer to classify and/or appraise properly the merchandise at issue.  In other words, while the import specialist may functionally perform the act of extending the liquidation, there may effectively be other Customs officials involved in the decision whether to extend liquidation who may believe certain circumstances require additional information in order for the appropriate Customs officer to classify or appraise properly the merchandise at issue and may be in an even better position to make that decision.  The wording in the Federal Circuit's opinion remanding this case for trial appears to support such a reading.  In discussing the standard for determining under what circumstances an ongoing fraud investigation might be a reasonable basis upon which Customs may extend liquidation, the Federal Circuit stated, "even if *Customs* expected the investigation to turn up information relevant to appraisement and classification, that expectation alone cannot justify summary judgment."  *Ford II*, 157 F.3d at 857 (emphasis added).  Thus, it appears, if Customs generally, including supervisors of the "appropriate customs officer" and/or the "appropriate customs officer" himself, believed information was needed or reasonably expected the investigation to turn up information relevant to appraisement or classification of the merchandise, such a need or expectation would fall within the confines of section 1504(b)(1).

to extend liquidation were reasonable.[14]  First, the government argues the appropriate Customs

official postponed liquidating the eleven entries while waiting for further information which was

necessary to ensure the correct classification and appraisement of the imported merchandise.

Second, although Customs extended the liquidation because it was Customs's policy to extend

liquidation during the pendency of a § 1592 investigation, it was reasonably expected that the

fraud investigation could produce information affecting the classification or appraisement of the

merchandise thus justifying the extensions.


The government points to the following evidence to support its argument that Customs's

decisions to extend liquidation were reasonable.  Defendant supports its first contention by

pointing to documentary evidence that McNally authenticated at trial indicating he had certain

concerns that needed to be addressed through discussions with Ford and/or through an

investigation.  The documents include handwritten notes from meetings in January 1986 and

February 1987 and the Significant Importation Report.  (*See* Def.'s Post-Tr. Br. at 3-4 (citing

Plaintiff's Exhibits (Pl.'s Exs.) 1, 3, 8, and 58 discussed in the Trial Transcript (Trial Tr.) at 90-

96, 102-04, 111-12, 126, and 185-86[15]).)  These documents indicate concerns regarding, among

---

[14]  The Court recognizes Ford, not the government, bears the initial burden of coming forward with the evidence.  For convenience, nevertheless, the Court discusses the evidence put forth by the government at this point.

[15]  The government also cites in its brief to "P-11" indicating reference to Plaintiff's Exhibit 11 (Pl.'s Ex.).  (*See* Def.'s Post-Tr. Br. at 3.)  A careful reading of the relevant pages in the trial transcript indicates, however, that rather than referring to Pl.'s Ex. 11 (which appears to be a chart indicating Customs extended liquidation on the eleven entries at issue), the transcript is intended to refer to Pl.'s Ex. 1-1.  *See* Trial Tr. at 90-91.

others things, Ford's 807 TSUS claims on some of the entries.[16] The government acknowledges

that although other areas of concern may also have existed, "McNally could not remember any

specific concerns other than those noted in his documents" at trial. (*Id.* at 4.)[17] Moreover, the

government argues, the fact that the Significant Importation Report only indicates the matter was

referred for investigation because of the quantum of money involved and not because of any need

for additional information, does not prove the matter was not referred for additional information.

Defendant points to testimony by various Customs officials indicating the Significant

Importation Report is not intended to be comprehensive. (*See* Def.'s Reply to Pl.'s Post-Tr. Br.

at 2-3 (citing Trial Tr. at 725-26 and 752-53).) Defendant also argues testimony at trial revealed

---

[16] For a complete list of the documents to which the government cites, *see* discussion *supra* Part II.B.

[17] The government also attempts to justify McNally's statement in his deposition in 1994 that although he could not remember any specific information he was waiting for after he prepared the Memorandum of Information Received with respect to classification or value of the merchandise, he must have been waiting for additional information because he referred the matter for investigation, and the entries were not liquidated. The government states that although at first blush this reasoning may appear faulty, it is really quite logical. The government argues,

> As an import specialist for 30 years, it would be inconceivable that McNally did not know the existing statutory bases for extending liquidations between 1985 and 1989. Given this fact, it is apparent that stating he must have needed more information by virtue of the fact that the liquidations were extended was McNally's "shorthand" way of indicating that, despite being unable to recall what specific information he needed or expected, inasmuch as he knew that he could not lawfully extend the liquidation of an entry without needing additional information to properly classify and/or appraise Ford's merchandise, the fact of the extension is evidence that, at the relevant time, he needed such additional information.

(Def.'s Post-Tr. Br. at 4-5.) The Federal Circuit identified this reasoning as circular—"Customs delayed because it needed more information yet argues it must have needed more information because it delayed." *Ford II*, 157 F.3d at 856. This Court agrees, and, therefore, does not consider McNally's deposition testimony on this point as evidence further information was needed for the proper classification or appraisement of the merchandise at issue.

that "a significant potential loss of revenue arising because of apparent substantive errors in the entries would . . . be a signal that something is amiss with the information provided for purposes of classifying and/or appraising the entered merchandise." (*Id*. at 3 (citing Trial Tr. at 729-30).)

Additionally, defendant points to the testimony of Hilton Duckworth to support its contention that further information was needed to classify and appraise the merchandise. Duckworth testified that if any entries remained unliquidated, all import specialists under his supervision had to "justify [to him] why entries remain unliquidated." Trial Tr. at 782. Duckworth further testified that a "rather significant percentage of entries – were immediately liquidated because there were no question [sic] concerning how the merchandise should be appraised and classified" and those that were not liquidated right away were reviewed by import specialists. Trial Tr. at 790. According to Duckworth, the "review was to determine whether or not the entries could be liquidated immediately or whether [the import specialist] needed additional information, in which case the entries would be placed in holding files . . ." until the import specialist "took action to obtain information." Trial Tr. at 791. Finally, the government argues Duckworth's testimony indicates it would be "unusual" for McNally to have had all the information needed to liquidate the entries properly but not to have taken that information into account until his final calculation. Duckworth testified, "with the significance of these importations, the amount of duty involved, the import specialist would have reviewed this situation from every possible angle, and other people would have looked at it." Trial Tr. at 862.

To support its second contention, the government points to McNally's testimony that whether a § 1592 investigation and/or an importer's culpability would affect the classification or

appraisement of merchandise would "depend on the particular circumstances," (Def.'s Post-Tr. Br. at 5 (citing Trial Tr. at 168)), and that McNally's estimate of the duty increase initially identified by him in the summer of 1986 "could have changed" "based on additional information [McNally] might have received prior to liquidation." (*Id.* (citing Trial Tr. at 237).) The government also points to Duckworth's affirmative response to questioning at trial that the circumstances under which fraud would be investigated could affect the information used by an import specialist to classify or appraise properly the merchandise. (*See id*. at 8 (citing Trial Tr. at 807-08).) The government additionally points to testimony by Fritz and Cortesi to support further this concept. (*See id*. at 13 (citing Trial Tr. at 361 and 370) and 17 (citing Trial Tr. at 727).) Testimony provided at trial, the government asserts, further indicates it is impossible to know, at the outset of an investigation, what information will be uncovered. (*See* Def.'s Reply to Pl.'s Post-Tr. Br. at 6 (citing Trial Tr. at 807-08, 819-20, and 874-76).) Moreover, the government points to Duckworth's testimony that he recalled in *this* case the entries were extended "to verify information needed to correctly classify the merchandise in light of the possible fraud and withholding of duties." (Def.'s Post-Tr. Br. at 9 (citing Trial Tr. at 818).) Additionally, the government argues, although Duckworth and Littlefield may not have made the decision to extend liquidation, there is no dispute that they knew liquidations could be extended only if Customs needed more information to classify and appraise properly the merchandise, and they nevertheless approved the extensions.[18] As the witnesses were government officials, the

---

[18] The government points, in particular, to evidence of Duckworth's signature on the Memorandum of Information Received indicating Duckworth concurred in the decision to refer the entries at issue for investigation. The Court notes defendant refers to Duckworth's signature on "Exhibit P-8, the MOIR," in its post-trial brief. (Def.'s Post-Tr. Br. at 8.) The Memorandum of Information Received, however, is identified in evidence as Pl.'s Ex. 9. As Duckworth's signature only appears on Pl.'s Ex. 9, the Memorandum of Information Received, the Court treats defendant's citation as a citation to Pl.'s Ex. 9, rather than to Pl.'s Ex. 8.

government argues, it should be presumed their actions were proper.

To prove Customs's extensions of liquidation were unreasonable, plaintiff appears to argue essentially two points. Plaintiff suggests no information was needed for the proper appraisement or classification of the merchandise by the appropriate Customs officer because: 1) McNally, the Customs officer in Cincinnati responsible for classifying and appraising the merchandise, had all the information required to complete the liquidation by mid-1986, and evidence from trial fails to support the proposition that he needed additional information for the proper appraisement or classification of the merchandise; and 2) McNally only extended the liquidation because it was Customs's policy to withhold automatically liquidation during the pendency of a § 1592 investigation, and McNally had no reasonable expectation that the investigation would produce information needed for classification or appraisement.

To support its contentions, Ford points to the Significant Importation Report dated July 29, 1986, which indicates McNally had in his possession as of the date of the report the eleven entries, correspondence, and documents from Ford and Ford's operating manual. (*See* Pl.'s Post-Tr. Br. at 2 (citing Pl.'s Ex. 8-3).) Further, Ford points to McNally's testimony at trial that he could not recall whether he subsequently requested additional documents or information from Ford or Customs after mid-1986.[19] (*See id.* at 2-3 (citing Trial Tr. at 137).) Ford also points to

---

[19] Ford also points to McNally's statement in his 1994 deposition, read into evidence in part, *see* Trial Tr. at 180-81, that he expected additional classification and value information after his July 1986 report. When asked what that information must be, McNally stated he could not remember but added he knew he was waiting for information because "[he] did not liquidate the entries." Trial Tr. at 181. As stated previously, *see supra* note 17, the Federal Circuit found, and this Court agrees, this reasoning is circular, and, therefore, this court does not consider McNally's deposition testimony on this point as evidence further information was needed for the

the language in the Significant Importation Report stating that McNally prepared a Memorandum of Information Received to the Office of Enforcement solely "'[b]ased on the significant amount of duty involved,'" (*id.* (quoting Pl.'s Ex. 8-3)), and to McNally's deposition testimony in 1994 that he could not recall any other reasons for the referral. Ford also cites McNally's testimony that he did not liquidate because it was Customs's policy not to liquidate entries under a § 1592 investigation and that he could not recall any other reasons why he did not liquidate the entries. Given McNally's testimony, Ford argues, "it cannot be presumed that McNally extended liquidation because he needed additional classification or value information." (*Id.* at 4.) Additionally, Ford cites the testimony of two Customs's agents—Special Agents Fritz and Kyle. According to Ford, Fritz testified "McNally never asked [Fritz] to obtain any information or documentation." (*Id.* (citing Trial Tr. at 307).) Kyle testified McNally did not "'either notify [Kyle] through writing or verbally in person'" that McNally needed information to allow him to liquidate the entries. (*Id.* at 5 (quoting Trial Tr. at 445).) Further, Ford points to evidence that although Duckworth, McNally's supervisor, could recall other reasons for extending liquidation,[20] he was not involved in making the decision to extend liquidation and, in all probability, did not justify the extensions until after the fact. (*See id.* (citing Trial Tr. at 814).) Moreover, Ford points to testimony by Duckworth that he could not recall any instances in which

---

proper classification or appraisement of the merchandise at issue.

[20] Hilton Duckworth, the Cincinnati Port Director and McNally's supervisor, testified that, to his recollection, liquidation was extended, "because of possible fraud and withholding of duties, and also to verify information . . . in order to be able to make a correct classification of the imported merchandise." Trial Tr. at 818.

McNally told him he needed additional information from anyone in order to classify or appraise

the merchandise.  (*See id.* at 6 (citing Trial Tr. at 822).)  Ford asserts, "McNally's silence to his

supervisor belies any presumption that he needed more information."  (*Id.*)


To support its second contention, Ford additionally argues in order to justify the

liquidation extension under the investigation, the Federal Circuit required that the record "'show

that the fraud investigation was *reasonably expected* to produce information about

"appraisement" and "classification."'"  (*Id*. at 9 (quoting *Ford II*, 157 F.3d at 856) (emphasis in

original).)  Ford interprets this standard as requiring that the relevant Customs officer, in this case

McNally, "must have had a subjective expectation that the fraud investigation would produce

information needed for classification or appraisement that was otherwise unavailable, and that

expectation must have been objectively reasonable."  (*Id*. (citing *Montgomery Ward & Co. v.*

*NLRB*, 668 F.2d 291, 298 (7th Cir. 1981) (identifying elements of "reasonable expectation" in

employment law context)).)  Ford argues because the evidence shows McNally did not tell his

supervisor he needed information nor did he seek or request information of any kind from the

agents, he had no expectation that the investigation would produce needed classification or

appraisement information.  Moreover, Ford argues, the evidence is clear that in this case, even if

there is a theoretical possibility that the fraud investigation could produce information regarding

classification or appraisement, the evidence shows McNally had no such subjective expectation.


Further, to support its second contention, Ford argues evidence in the record indicates

Customs could not reasonably expect the investigation would yield needed classification or

appraisement information from the mere pendency of an 807 audit of FERCO.  First, Ford points

to evidence that Ford only claimed 807 treatment on four of the eleven entries. (*See id.* at 7 (citing Ct. Ex. 1, Sched. C, ¶ 50).) Second, Ford points to evidence it claims shows the FERCO audit was only concerned with possible commingling of U.S. and foreign parts assembled into radios entered by FERCO at Landsdale, Pennsylvania, *see* Pl.'s Ex. 50, and not with 807 claims on the subject entries involving engines and transmissions in Louisville.

Upon examination of the documentary and testimonial evidence admitted at trial, this Court finds Ford has not put forth sufficient evidence to satisfy its burden of showing it was unreasonable for Customs to extend liquidation on the premise that information needed for the proper appraisement or classification of the merchandise was not available to the appropriate Customs officer. Ford has not met its burden of eliminating all reasonable bases for extending the liquidation and thus has not shown Customs abused its discretion in deciding to extend liquidation in the first instance. First, the evidence to which Ford cites to support its contention Customs had all information needed to classify or appraise the merchandise by the initial extension fails to demonstrate the same. Although the Significant Importation Report indicates that as of July 1986, McNally had certain information, such evidence is not dispositive that McNally did not need additional information. Indeed, evidence adduced at trial indicates otherwise. For example, evidence indicates that, at least initially, McNally had some concerns there might be an 807 issue regarding the imported engines and transmissions in the Louisville FTSZ. *See* Trial Tr. at 893. Documentary evidence further indicates that at least as of February 6, 1987, Tullock[21] agreed to furnish any additional information needed concerning the 807 issue

---

[21] It was not established conclusively at trial that Tullock was the person who agreed to forward the 807 information; however, such a conclusion, the Court believes, would be a fair

to Customs. This apparent need for 807 information exists despite the fact that, in hindsight, as Ford points out, it appears the 807 issue may not have concerned engines and transmissions at the Louisville FTSZ but rather electronic parts entered through Philadelphia or Landsdale. *See* Trial Tr. at 889-93. The testimony combined with the documentary evidence indicating Tullock would forward needed information concerning the 807 issue indicates to this Court that some information concerning the 807 issue was believed to be outstanding at least as of February 1987. Additionally, Duckworth testified the entries were extended in part "to verify information . . . in order to be able to make a correct classification of the imported merchandise." Trial Tr. at 818. That Customs extended liquidation in part to verify information suggests additional information might have been needed to assure the accuracy of the information already in Customs's possession. Moreover, that McNally could not recall any instances in which he requested additional documents or information from Ford or Customs is inconclusive. McNally's failure to recall that he requested information is neither evidence he never requested information nor, more importantly, evidence he did not need additional information. Based on the evidence presented by Ford, it simply has not been able to show it was unreasonable for Customs to extend liquidation on the premise that information needed for the proper classification or appraisement of the merchandise was unavailable to the appropriate Customs officer.

Second, regarding Ford's citation to the Significant Importation Report, testimony at trial indicates the Significant Importation Report is not intended to be a comprehensive document.

---

reading of the notes referring to "807.00 info" on Pl.'s Ex. 58-3. Thus, for the purposes of stating that information concerning the 807 issue likely was needed as of February 6, 1987, the Court will refer to the person who agreed to forward the information as "Tullock."

*See* Trial Tr. at 725-26 and 752-53. Thus, the fact that the Significant Importation Report only indicates the reason for the referral was because of the significant amount of duty involved does not prove McNally did not also refer the case because information was needed to classify or appraise the merchandise.

Additionally, the evidence put forth by Ford concerning the testimonies of Fritz, Kyle, and Duckworth fails to show it was unreasonable for Customs to extend liquidation on the premise that information needed for the proper appraisement or classification of the merchandise was not available to the appropriate Customs officer. First, the credibility of both Fritz's and Kyle's statements to which Ford cites is called into question in light of the surrounding testimony of each witness.[22] Ford points to Fritz's statement that McNally did not "ever ask

---

[22] Fritz testified, in relevant part:

> Q. Do you recall [McNally] ever asking of you that you obtain any particular documentation for him, other than what was forthcoming as a result of your service of the summons in February?
> A. No.
> Q. Did [McNally] ever ask you to obtain any information for him?
> A. No.

Trial Tr. at 307.

Kyle testified, in relevant part:

> Q. I believe you testified that Mr. McNally never requested you to provide any information regarding classification and appraisement; is that correct?
> A. That's my recollection.
>
> . . .
>
> Q. Did you have any way of knowing that Mr. McNally might have needed information to allow him to liquidate the entries if he didn't tell you that he needed that information?

[Fritz] to obtain any information for him." Trial Tr. at 307. In the previous question, however, Fritz testified that he could not recall McNally "ever asking of [him] that [he] obtain any particular documentation for [McNally]." Trial Tr. at 307. The Court is skeptical that Fritz could remember that McNally never asked Fritz to obtain information but could not recall whether McNally ever asked him to obtain any particular documentation. Further, Ford points to Kyle's statement that if McNally needed information from Kyle to allow him to liquidate the entries, "[McNally] could either notify [Fritz] through writing or verbally in person . . . and he did not do any of those." Trial Tr. at 445. Kyle testified, however, shortly before making this statement that it was his "recollection" that "McNally never requested [him] to provide any information regarding classification and appraisement." Trial Tr. at 444. The Court wonders how Kyle did not know with certainty but only "recalled" that McNally never requested him to provide information but yet knew with certainty that McNally did not notify him that he needed information. Moreover, Duckworth in his testimony merely states that he did not "recall" any instance in which McNally requested information from the agents or that he did not "recall" that McNally ever indicated to Duckworth that he expected to receive such information.[23]

---

> A. He could either notify me through writing or verbally in person or writing and he did not do any of those.

Trial Tr. at 444-45.

[23] Duckworth testified, in relevant part:

> Q. Do you recall any instance where Mr. McNally requested information from the agents that he needed in order to appraise or classify the merchandise?
> A. At this point, no, I don't recall that.
> Q. Do you recall him ever indicating to you that he expected to receive such information?
> A. No.

Duckworth's failure to recall is neither evidence McNally never requested information from the agents or that McNally did not expect to receive such information nor, more importantly, evidence McNally did not need additional information.

Moreover, even if the testimony proffered were to show what plaintiff purports it to show, the mere absence of evidence to support the proposition that information needed to classify and appraise the merchandise properly was unavailable to McNally does not prove that such information was not needed. To argue as such is analogous to committing the fallacy of *argumentum ad ignorantiam*. This fallacy occurs when one claims that the absence of evidence in support of a proposition establishes that the proposition is false. In most cases, such an assumption is false. *See generally* IRVINE M. COPI, INTRODUCTION TO LOGIC 57-58 (2nd ed. 1961). Thus, the alleged lack of evidence to support the proposition that information needed for the proper appraisement or classification of the merchandise at issue was not available to the appropriate Customs officer would not prove the proposition is false or that it was unreasonable for Customs to extend liquidation on that premise.

Moreover, this Court finds Customs did not abuse its discretion in extending liquidation as plaintiff has not shown Customs did not reasonably expect the investigation to produce information about appraisement or classification. A need for internal information, like that sought by Customs in the fraud investigation, may satisfy the requirements of section 1504(b)(1). *See Ford II*, 157 F.3d at 856; *A Classic Time v. United States*, 20 CIT 1198, 1203, 942 F. Supp.

---

Trial Tr. at 822.

589, 594 (1996) (citing *Detroit Zoo.*, 10 CIT at 138, 630 F. Supp. at 1356-57 (stating the "term 'information' as it is used in the statute, . . . should be construed to include whatever is reasonably necessary for proper appraisement or classification of the merchandise involved. When a request for internal advice of a classification decision is granted, the 'information' required to make the appropriate classification includes that advice.")); *see also International Cargo & Surety Ins. Co.*, 15 CIT at 546, 779 F. Supp. at 178-79.  According to the Federal Circuit in its opinion remanding this case for trial, in order for the fraud investigation to justify the liquidation extensions, the record must "show that the fraud investigation was reasonably expected to produce information about 'appraisement' and 'classification.'"  *Ford II*, 157 F.3d at 856.  Plaintiff predominately focuses its argument on whether McNally himself had a reasonable expectation that the investigation would or could produce information about appraisement or classification and argues no such expectation existed primarily because the evidence shows McNally "did not tell his supervisor that he needed such information, nor did he seek or request information of any kind from the agents."[24]  (Pl.'s Post-Tr. Br. at 9.)

Ford puts forth substantially the same evidence here to support its claim that McNally did not have a reasonable expectation the investigation would produce information about the classification or appraisement of the merchandise at issue as it did to support its prior assertion that it was unreasonable for Customs to extend liquidation on the premise information needed for the proper appraisement or classification of the merchandise at issue was not available to the

---

[24] Ford bases its conclusion on the legal standard and reasoning provided in *Montgomery Ward & Co. v. NLRB*, 668 F.2d 291 (7th Cir. 1981). *Montgomery Ward* discusses a reasonable expectation standard in an employment context. *See id.* at 298.  This Court finds this standard inapposite to a determination by Customs.

appropriate Customs officer.  As discussed at length above, however, the Court is not persuaded

by Ford's evidence.  In other words, Ford has failed to meet its burden of proof.  The Court notes

the mere absence of evidence to support the proposition that McNally reasonably expected the

investigation to produce information about appraisement or classification does not prove

McNally did not have such an expectation.

Moreover, as much as Ford appears to have tactically decided to focus all its attentions on

McNally, it has failed in its burden to prove whether other responsible officers of Customs *as a

whole* may not have had a reasonable expectation that the investigation would produce

information about classification and appraisement of the merchandise at issue.[25]  Indeed,

evidence on the record suggests otherwise.[26]

Testimony also indicates it is impossible for Customs to know with precision at the onset

of the investigation what information ultimately could be revealed.  *See* Trial Tr. at 877.  Further,

testimony indicates, and this Court agrees, even if Customs is forced to liquidate the entries

pursuant to a statutory cap of four years without the benefit of the results of the investigation, the

reasonableness of awaiting the results of the investigation is not undermined as the

reasonableness of the extensions must be viewed from the time the extensions are issued, and

Customs may not know until the end of the investigation whether the information would affect

---

[25] *See* discussion *supra* note 13.

[26] Testimony at trial from McNally, Duckworth, Fritz, and Cortesi overwhelmingly indicates that during the ongoing fraud investigation, a reasonable expectation of Customs was that the investigation could turn up information relating to classification or appraisement of merchandise being investigated. *See* Trial Tr. at 237, 807-08, 361, 370, and 727.

the classification or appraisement of the merchandise. *See, e.g.*, Trial Tr. at 807-08. Moreover, the evidence does not indicate Customs had any reason to believe that in this case the investigation would not lead to information which could assist the appropriate Customs's official in properly classifying or appraising the merchandise. Accordingly, this Court finds Customs did not abuse its discretion in extending the time for liquidation of the entries while its investigation pursuant to 19 U.S.C. § 1592 was ongoing.[27]

This Court makes this finding in light of the fact that the decisions of Customs are presumed to be correct and burden of proving otherwise is on Ford. *See* 28 U.S.C. § 2639(a)(1); *St. Paul*, 6 F.3d at 768; *see generally Century Importers*, 205 F.3d at 1311. *St. Paul* requires that the importer overcome this presumption by a preponderance of evidence. *See St. Paul*, 6 F.3d at 769. Further, the government is entitled to rely on a presumption of regularity, that is, "it may be presumed that the import specialist . . . properly performed [his] duties." *Id.* This Court finds Ford has not met this burden and Ford has not rebutted either of these presumptions.

---

[27] Such a finding is not in conflict with the purposes of section 1504. Prior to the enactment in 1978 of 19 U.S.C. § 1504, Customs could delay liquidation as long as it pleased, with or without giving notice. *See, e.g., Ambassador Div. of Florsheim Shoe v. United States*, 748 F.2d 1560, 1562 (Fed. Cir. 1984); *see* S. REP. NO. 95-778, 95th Cong., 2d Sess. 1, 32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2211, 2243. Section 1504 was added simply to "increase certainty in the customs process for importers, surety companies, and other third parties with a potential liability relating to a customs transaction." S. REP. NO. 95-778, 95th Cong.; U.S.C.C.A.N. at 2243. It was also enacted to accommodate requests from trade partners that the government establish a time limit within which liquidation must occur. *See Ambassador*, 748 F.2d at 1562-63. However, the legislative history does not indicate that the statute was intended to tie the hands of Customs to such an extent that it would be difficult for Customs to fulfill its responsibility of properly classifying or appraising imported merchandise—a situation which may well develop where Customs is forced to liquidate even despite the presence of an ongoing fraud investigation concerning the very merchandise with which Customs is charged to classify or appraise properly.

It may well be argued that to meet its burden the importer has a difficult task indeed. Nevertheless, Congress placed this burden upon the importer. In situations where, as here, the decision by Customs to extend liquidation was made on the basis of section 1504(b)(1), such a burden requires the importer prove it was unreasonable for Customs to extend liquidation on the premise that information needed for the proper classification or appraisement of the merchandise at issue is not available to the appropriate Customs officer or, in the case of a fraud investigation, as the Federal Circuit has indicated, where the fraud investigation was reasonably expected to produce information about appraisement or classification. This Court will not lessen that burden absent a clear directive from Congress or our appellate Court.

### b. *Length of the Extensions*

Although the Court finds plaintiff failed to show it was unreasonable for Customs to extend liquidation on the premise that information needed for the proper appraisement or classification of the merchandise at issue was unavailable to the appropriate Customs officer or that Customs did not reasonably expect the fraud investigation to produce such information, Customs's extensions—especially in October of 1987 and October 1988—cannot be sustained if plaintiff can show the length of the extensions was unreasonable. *See generally Detroit Zoo.*, 10 CIT at 138, 630 F. Supp. at 1357 (stating "an extension [may] be granted only for a reasonable period of time relative to the situation"). The Federal Circuit in remanding this case for trial specifically stated that the length of time it took Customs to process information and liquidate the entries and the length of the fraud investigation are subject to scrutiny for reasonableness. *See Ford II*, 157 F.3d at 856 (stating, "[a] full airing of the facts may disclose that [Customs's delay] was unreasonable and therefore an abuse of Customs' discretion," and "the length of the

fraud investigation is subject to scrutiny for reasonableness"). Thus, this Court analyzes Ford's proffered evidence concerning the reasonableness of Customs's delay in seeking and processing information and the reasonableness of the length of the investigation relative to the situation.[28]

Ford argues even if the Court were to find Customs needed additional information to appraise or classify properly the merchandise at issue or reasonably expected the investigation to produce such information, the entries must be deemed liquidated "as entered" by operation of law due to unreasonable delays on the part of Customs. Ford attempts to show the unreasonableness of Customs's delays by pointing to evidence of alleged inactivity in the investigation by Fritz, the first Special Agent assigned to the investigation, and statements made and documents created by Kyle, the second Special Agent assigned to the investigation, indicating he was waiting for information from McNally and that McNally failed to produce the desired information.

Regarding Fritz, although Ford acknowledges he had "other priorities," Ford concludes "it is reasonable to believe that had he devoted even minimal time to the case in the 7 ½ months between early March 1987 and the second extension in October 1987, the investigation could have been concluded well before the second extension." (Pl.'s Post-Tr. Br. at 18.) Ford appears to draw this conclusion based on the fact that Kyle recalled "most of the case had already been

---

[28] Ford, in its papers before the Court, principally puts forth evidence regarding the reasonableness of the length of the investigation and appears to focus on the reasonableness of the length of time it took Customs to process information and liquidate the entries within that context. The Court's analysis likewise focuses on the reasonableness of the length of the investigation and, within that context, to the extent relevant, on the reasonableness of the time it took Customs to process the information and liquidate the entries.

completed" at the point the investigation was transferred to him, *see* Trial Tr. at 381-82; thus, all that remained to be finished was for Fritz to interview Ford and Customs personnel to determine further culpability. *See* Trial Tr. at 329.

Regarding Kyle, Ford argues that "[t]he record establishes that the only reason Agent Kyle could not expeditiously close out the investigation upon being assigned the case in late 1987 was McNally's delay." (Pl.'s Post-Tr. Br. at 18.) Ford singles out Kyle's testimony indicating all he needed or wanted at some point in 1988 was for McNally to determine the appropriate rate of duty and provide Kyle with that information. *See* Trial Tr. at 385, 391, and 406. Ford cites, in particular, to testimony by Kyle that McNally admitted he did not work on the Ford matter for a long stretch in 1988, some seven or eight months, because he was busy with other work. (Pl.'s Post-Tr. Br. at 19 (citing Trial Tr. at 391).) Ford also points to notes from a meeting in February 1989 indicating McNally was to rectify certain discrepancies in figures on various documents in the entry packet. *See* Pl.'s Ex. 29-2. But, Ford argues, "these were tasks that McNally had known about for several years." (Pl.'s Post-Tr. Br. at 19.) Moreover, Ford contends, McNally's delay is not justified regarding any 807 issues for similar reasons. For example, Ford points to notes taken at a meeting in February 1987 between Ford and Fritz which suggest some 807 information was on file as of that date, *see* Pl.'s Ex. 58-5, and that Ford agreed to supply any additional information if needed. *See* Pl.'s Ex. 58-3 and 58-5. Ford contends, however, McNally did not send Ford a request for additional 807 information during the two year period from February 1987 to February 1989. That McNally concluded, based on the same information he had in February 1987, there was no 807 problem, Ford contends, proves it was unreasonable to extend liquidation on this basis because no further 807 information was needed.

(*See* Pl.'s Post-Tr. Br. at 20 (citing Pl.'s Ex. 34).)  Ford also points to evidence that Kyle made

repeated requests to McNally for the information and that McNally failed to comply.  (*See id.* at

21-22 (citing Trial Tr. at 400; Pl.'s Ex. 17).)  Although Ford states Kyle admitted he had a heavy

workload, Ford points to Kyle's testimony that he was not impeded by other investigations on

this case.  *See* Trial Tr. at 444.  Thus, Ford contends, when considered in light of McNally's

unexplained delays, the October 1988 extension, in particular, was unjustified and an abuse of

Customs's discretion.


Defendant puts forth the following evidence in support of its contention that the length of

the fraud investigation was reasonable.  First, regarding Fritz, the government points to evidence

that once Fritz was assigned the case in November 1986, he reviewed the Memorandum of

Information Received and discussed the investigation and the reasons for the referral with

McNally sometime prior to December 2, 1986.  (*See* Def.'s Post-Tr. Br. at 12 (citing Trial Tr. at

309-10).)  The evidence indicates Fritz engaged in activities concerning Ford through February

17, 1987, when Ford provided documents to Customs pursuant to a summons served on Ford.

*See* Trial Tr. at 314 and 323-24.  Fritz further admitted he reviewed the summoned documents

for some time after their receipt.  *See* Trial Tr. at 325.  The government points to additional

evidence indicating Fritz continued activity on the investigation through March 4, 1987, when

Fritz interviewed Port Director Trussel but admits Fritz took no further action.  *See* Pl.'s Ex. at

27-5.  The government points to Fritz's testimony that although he "endeavored to be efficient

and to complete his investigations as quickly as possible," (Def.'s Post-Tr. Br. at 14 (citing Trial

Tr. at 353)), he "had other priorities during that time" (*id.* (citing Trial Tr. at 328)), "including

other investigations" (*id.* (citing Trial Tr. at 352)) and responsibilities (*see id.* at n.16 (citing Trial

Tr. at 356)).[29]  Further, there were no factors which would have required the investigation to be

expedited.  (*See id.* at 15 (citing Trial Tr. at 353).)


Regarding Kyle, the government points to testimony from Kyle that once he received and

read the case, he discussed it with Fritz, a process which took several months.  (*See id.* (citing

Trial Tr. at 384).)  Kyle testified that after reviewing the file, he determined he needed more

information to complete the investigation, *see* Trial Tr. at 409, and he needed to interview

additional Customs personnel.  *See* Trial Tr. at 405 and 410.  The government also points to

evidence that some time in 1988 Kyle began feeling he was having trouble completing the

investigation because he was waiting for information from McNally and that he would "'from

time to time'" request that information.  (Def.'s Post-Tr. Br. at 16 (quoting Trial Tr. at 388-90

and 441).)  The government points out, however, that no notes of such conversations exist until

after February 21, 1989.  (*See id.* (citing Trial Tr. at 443).)  Moreover, the government points to

evidence that at the time Kyle was assigned to the case, he was busy setting up the Bowling

Green office.  The government cites evidence that Kyle was in charge of hiring and training staff,

obtaining furniture and equipment, and handling all administrative responsibilities of the office.

(*See id.* at 15 (citing Trial Tr. 430-32).)  Additionally, the government cites evidence that Ford

was only one of 25-50 cases assigned to Kyle from 1987-90.  *See* Trial Tr. at 432.  Robert

Cortesi, the Resident Agent In Charge at U.S. Customs in Cincinnati, Ohio, the manager of the

---

[29]  These other responsibilities included "[f]or example, during the Fall of 1986, Fritz worked full-time for about thirty days with the Cincinnati Airport Narcotic Intervention Unit and in the Summer of 1987, he worked for about thirty days as the sole staff at the Bowling Green office.  Fritz was also out on sick leave at the time the matter was transferred to Bowling Green." (Def.'s Post-Tr. Br. at 14 n.16 (citing Trial Tr. at 356).)

Cincinnati Office of Investigations and the Bowling Green sub-office, and the supervisor of all

special agents, including Fritz and Kyle, testified that the gaps between the activities on the case

were "reasonable" given the amount of information that had to be reviewed, the activity in the

Bowling Green office at that time, and the other responsibilities assigned to the agent. *See* Trial

Tr. at 740-44. Given all the evidence on the record, the government contends, Ford has not

demonstrated the amount of time consumed was unreasonable or that the investigation could

have or should have ended sooner.[30]

Upon examination of the evidence admitted at trial and after full consideration of the

parties' contentions, this Court finds Ford has not demonstrated that the amount of time

consumed was unreasonable or that the investigation could have or should have concluded

sooner. First, with respect to the evidence proffered by Ford concerning the delays in the

investigation under Fritz, the Court finds Ford has not shown the period of time Fritz took to

work on the investigation was unreasonable. The record shows there was activity on the case

from the time the case was assigned to Fritz in August 1986 at least through March 4, 1987,

---

[30] The Federal Circuit in remanding this case for trial raises the issue of the reasonableness of the length of the fraud investigation based on, for example, the need for 807 information. *See Ford II*, 157 F.3d at 867. The Court notes, however, that the government, in its papers submitted to this Court, does not look to the 807 issue to justify the length of the fraud investigation. Rather, the government focuses on the special agents' need for additional information to complete the investigation, including the need to interview witnesses, even subsequent to the time in which the three extensions were granted. As defendant does not look to the 807 issue as a reason to justify the length of the fraud investigation, the Court will not address the reasonableness of the length of the investigation from the perspective that more information regarding the 807 issue was outstanding. This is not meant, however, to affect the Court's finding in Part III.A.3.a that, at least as of February 1987, it appears Customs may have believed it needed information regarding TSUS 807 to classify or appraise properly the merchandise at issue.

when Fritz interviewed Art Trussell, the former Louisville Port Director. Although it does not

appear Fritz conducted additional activities on the case between March-November 1987, such an

observation does not show the inactivity on the case was necessarily unreasonable. Rather,

evidence suggests Fritz had other commitments and time constraints which limited his ability to

work on the case. In addition to being assigned to other investigations, *see* Trial Tr. at 352, Fritz

worked as the sole staff at the newly created Bowling Green office for thirty days during the

summer of 1987. *See* Trial Tr. at 357. Additionally, Fritz testified he was out on sick leave

when the file was transferred. *See id.* While it is unclear how long Fritz was on sick leave

before the file was transferred, the time it took Fritz to conduct the Ford investigation, given

Fritz's overlapping obligations, cannot be found by this Court to be unreasonable.

Also, with respect to the evidence proffered by Ford concerning the delays in the

investigation under Kyle, the Court finds Ford has not shown there were unreasonable delays in

the investigation. Ford essentially argues the only reason Kyle could not expeditiously close out

the investigation was due to delays by McNally. Kyle admitted, however, that although he

primarily needed information from McNally to complete the investigation, he also needed to

interview four or five witnesses. *See* Trial Tr. at 409-10. Evidence in the record shows Kyle did

not interview at least two of these witnesses until the end of 1989—well past the last extension

for liquidation in October 1988.[31] Thus, even if McNally had supplied information to Kyle more

---

[31] Kyle testified he interviewed one witness, George Birkholtz, on or about November 8, 1989, *see* Trial Tr. at 413; Pl.'s Ex. 41-9, and a second witness, Nancy Pohl, on or about December 28, 1989. *See* Trial Tr. at 417; Pl.'s Ex. 38.

expeditiously,[32] Ford does not point to evidence which indicates Kyle could have completed the investigation without interviewing the additional witnesses.[33] Also, the Court finds it was not unreasonable for Kyle not to have conducted the interviews sooner in the investigative process as he had a heavy caseload and had numerous responsibilities in connection with setting up the Bowling Green office during the time in which he was assigned to the case. *See* Trial Tr. at 429-32. In light of all the evidence and noting that Kyle still had to interview additional witnesses before he could complete the investigation, notwithstanding McNally's apparent inaction, this Court cannot find, as a matter of law, Ford has shown the amount of time taken to complete the

_____

[32] Although it appears McNally may not have acted expeditiously, evidence on the record does not support the forcefulness of plaintiff's contention. First, Kyle testified that prior to sending out the written memo in March 1989, he contacted McNally from "time to time," Trial Tr. at 390, or "periodically," Trial Tr. at 441. While the Court does not question that Kyle contacted McNally during this period, on the basis of Kyle's testimony, it is unclear how often Kyle contacted McNally prior to his sending the memorandum. *See* Trial Tr. at 391. It is clear, however, that no other written request was made before March 1989. *See* Trial Tr. at 442-43. Second, Kyle testified McNally told him he did not work on the Ford matter for seven to eight months during this time because he had "other work." Trial Tr. at 390-91. While having other work may not excuse McNally's failure to respond indefinitely, it is not necessarily unreasonable for McNally to delay his responses for a few months in light of other work priorities. Thus, the evidence presented by plaintiff is not sufficient to indicate the investigation could have been completed prior to the October 1988 extension based solely on McNally's alleged delays.

[33] Although Ford notes Kyle stated these witnesses were "'peripheral'" to his investigation and did "'not hav[e] anything to do with the direct submission of the entries,'" (Pl.'s Post-Tr. Br. at 18-19 n.15 (quoting Trial Tr. at 405)), such statements are not dispositive as to whether the interviewer could elicit unsolicited information during the interview. As the Court pointed out at trial and Kyle agreed, *see* Trial Tr. at 418, when an individual interviews a witness with a preconceived notion as to what the individual expects to elicit from the witness, such expectations are not controlling as to what the witness ultimately states. Thus, merely because the purpose of the interview was narrow is not controlling as to what may ultimately be revealed. Moreover, Ford does not show Kyle could have closed out the investigation without conducting the interviews. Indeed, Kyle testified that he "needed to talk to [the witnesses he interviewed] . . . to find out what verbal directions were given to Ford Motor Company" "before [he] wrapped up the case." Trial Tr. at 406-07.

investigation was unreasonable or that the investigation could or should have been completed

sooner. Although it is unclear how long an extension would be reasonable, this Court cannot

conclude that, based on the facts before it, the delay was so great as to constitute an abuse of

discretion, thereby invalidating the extensions.

B.       *Clerical Errors Under 19 U.S.C. § 1520(c)(1)*

Alternatively, Ford contends its failure to pay duties before entering the engines and

transmissions into the Louisville FTSZ and its designation of those parts as NPF instead of PD

are correctable under 19 U.S.C. § 1520(c)(1).[34] Section 1520(c)(1) permits the reliquidation of

an entry to correct for, among other things, clerical error, if the claim is timely made.[35] *See B.S.*

*Livingston & Co. v. United States*, 13 CIT 889, 891 (1989). This Court has found section

1520(c)(1) is not a remedy for every conceivable mistake or inadvertence but rather offers

"limited relief in the situations defined therein." *PPG Indus.,* 7 CIT at 123 (citations and

quotations omitted). Section 1520(c)(1) only permits relief when the "clerical error" does not

---

[34] Section 1520(c)(1) states, in pertinent part:

> Notwithstanding a valid protest was not filed, the appropriate customs officer may, in accordance with regulations prescribed by the Secretary, reliquidate an entry to correct—
>> (1) a clerical error, mistake of fact, or other inadvertence not amounting to an error in the construction of a law, adverse to the importer and manifest from the record or established by documentary evidence, in any entry, liquidation, or other customs transaction, when the error, mistake, or inadvertence is brought to the attention of the appropriate customs officer within one year after the date of liquidation or exaction . . . .

19 U.S.C. § 1520(c)(1). The regulation implementing section 1520(c)(1) essentially mirrors the statutory language. *See* 19 C.F.R. § 173.4(b) (1985).

[35] There is no cause of action before this Court that the claim was not timely made.

amount to an "error in the construction of the law." *Occidental Oil & Gas Co. v. United States*, 13 CIT 244, 246 (1989). The party seeking to correct the error must show that its error fits within one of the statutory categories. *See Ford II*, 157 F.3d at 857. Thus, in order for Ford to prevail on this issue, it must show that its alleged errors are correctable under section 1520(c)(1).

A clerical error is a mistake made by a clerk or other subordinate upon whom "no duty devolved to exercise original thought or judgment." *S. Yamada v. United States*, 26 CCPA 89, 94 (1938). The Federal Circuit stated in its opinion remanding this case for trial that "[w]hen a subordinate is given binding instructions on particular aspects of a task, no duty devolves upon him to exercise discretion or judgment in carrying out those aspects." *Ford II*, 157 F.3d at 860. Thus, *Yamada* teaches that "a subordinate acting contrary to binding instructions commits a clerical error." *Id.* Even if the importer establishes the presence of a "clerical error," "Customs may show that the error is not correctable [under § 1520(c)(1)] by showing that a noncorrectable error of those who did have discretion in the matter contributed to the mistake." *Id.*

In remanding this case for trial, the Federal Circuit found "[t]he record raises material issues of fact that bear on whether Tullock's mistakes are correctable." *Id.* at 861. Specifically, the Federal Circuit stated (1) "the record shows a dispute over whether Tullock's supervisors provided him with complete instructions, *i.e.*, instructions covering and binding Tullock in the aspects in which he erred" and (2) "the record shows a dispute over whether Tullock's supervisors made uncorrectable contributing errors, so as to preclude the correction of what otherwise might be correctable errors on the part of Tullock." *Id.*

To demonstrate that Tullock committed "clerical errors," Ford must prove he was given "complete, binding, non-discretionary instructions" to the following effect:

> For every car part entering the FTSZ, Tullock was to check the "non-privileged foreign" box on a CF214, and after the car was assembled, complete CF7501 and pay a 2.6% duty. For every truck part arriving at the FTSZ, he was to check the "privileged domestic" box on a CF214, and immediately complete CF7501 and pay a 3.3% duty.

*Id.* (emphasis omitted).

Ford argues Tullock committed clerical errors because the record reflects Tullock received clear, complete, and binding instructions regarding the designation of the zone status of the merchandise and the timing of duty payment from which Tullock had no discretion to deviate, and Tullock acted contrary to those binding instructions. To show Tullock received clear and complete instructions, Ford points to the following evidence: (1) the Ford FTSZ manual; (2) other materials Tullock received during his training; and (3) oral instructions from Lars Anderson, the Ford staff FTSZ coordinator. As proof that Tullock understood those instructions, Ford points to two memoranda from Tullock in 1985 to William Kuchenbrod, Tullock's general supervisor in Louisville, and J.T. Wingart, a Materials Manager at the plant, and to evidence that he orally communicated his understanding of the instructions to Anderson. Further, Ford points to the following evidence to show the instructions were binding: (1) testimony of Alan Moody, Supervisor of Ford's Customs Department and overseer of the FTSZ program, stating Tullock had no discretion regarding the designation of zone status and payment of duties on car and truck parts, including the timing of the duty payments; (2) testimony of Anderson stating that Tullock had no discretion to make an entry; and (3) testimony of Kuchenbrod stating that Tullock had no discretion to decide which engine or transmission went into Broncos or Rangers.

Ford also argues that the record establishes Tullock was well-trained and well-supervised, thus indicating Tullock's errors were one correctable under section 1520(c)(1). Plaintiff points to evidence that Anderson was in close contact with Tullock regarding his FTSZ duties and reviewed documents with Tullock, including the FTSZ manual and other FTSZ documents. Additionally, Tullock could contact Anderson or Moody if he had questions or concerns. *See* Trial Tr. at 567. Ford points to evidence that Anderson visited Tullock at the Louisville plant particularly when the FTSZ record system was being created and the FTSZ was being activated. *See* Trial Tr. at 560, 566; *see also* Pl.'s Ex. 75 at 210. Ford also emphasizes the training Tullock received and points to evidence that Tullock visited other FTSZs such as Wayne, Michigan and Wixom, Ohio and saw how the FTSZs operated first-hand. *See* Trial Tr. at 562-63. Thus, Ford argues, Tullock was well-trained and well-supervised and only needed to follow the "clear and binding instructions" he was given. (Pl.'s Post-Tr. Br. at 30.) That Tullock failed to do so, Ford argues, constitutes "clerical errors" which are correctable under section 1520(c)(1).

The government claims Tullock's errors were not "clerical errors" under 19 U.S.C. § 1520(c)(1) because the instructions provided Tullock were not complete in that they did not include instructions on interchangeable parts. Essentially, the government argues even if Tullock were aware of the differences between PD and NPF status and the timing of duty payments for goods in these statuses, he nonetheless lacked the awareness of "how to place the specific goods arriving in Louisville in the proper status or how to pay duties at the appropriate time for those goods." (Def.'s Reply to Pl.'s Post-Tr. Br. at 8 (emphasis omitted).) The critical point missing from Tullock's instructions, the government contends, was how Tullock was supposed to determine, for the interchangeable parts, which parts were for trucks and which were for cars

before the parts entered the FTSZ.  As no system existed at the Louisville plant by which

interchangeable car and truck parts could be distinguished as they arrived, there was no way for

Tullock to carry out any binding instructions.  Further, the government argues Ford was

otherwise responsible for Tullock's errors because Ford improperly trained and supervised

Tullock in his capacity as the FTSZ Coordinator.  Thus, according to the government, the errors

committed by Tullock cannot be corrected under 19 U.S.C. § 1520(c)(1).

After consideration of the parties' arguments and the evidence admitted at trial, this Court

finds Ford did not commit "clerical errors" that would allow it relief under 19 U.S.C. §

1520(c)(1).  Regarding whether Tullock received clear and complete instructions, the evidence to

which Ford points establishes the following.  First, Ford points to a document identified as

Ford's manual for supervising a foreign trade zone.  It is entitled, "Ford Foreign Trade Subzone:

Louisville Assembly Plant."  *See* Pl.'s Ex. 59.  Although the document discusses some aspects of

the operating procedure for a subzone and the reporting requirements of a FTSZ Coordinator, the

document does not explain what is to be done with PD merchandise, nor does it associate PD

status with trucks, nor does it explain the timing of the payments.

Second, Ford points to oral instructions given by Lars Anderson.  *See* Pl.'s Ex. 75 at 13.

While Anderson's deposition testimony confirms that he gave verbal instructions to Tullock, it

only indicates specifically that he instructed Tullock regarding when PD was to be used (for

trucks) and when payment for PD status was to be made ("up front").  *See* Pl.'s Ex. 75 at 244.

Though Moody attempted to clarify at trial what other instructions might have been given by

Anderson to Tullock[36], Moody was not in a position to testify as to the exact content of those

instructions.[37] Thus, Moody's testimony does not assist the Court further in understanding

whether Tullock received complete instructions.


Perhaps the best evidence that Tullock, at least in part, received instructions and

understood the procedures are the memoranda sent by Tullock to William Kuchenbrod, his

immediate supervisor, and J.T. Weingart. Tullock's memorandum to Kuchenbrod states, in

---

[36] For example, Moody testified, in relevant part:

> Q. So are you saying that Mr. Tullock was given specific instructions as to the specific zone status to declare on car parts and the specific–
> A. Oh, yes.
> Q. –specific zone at that time to pay on truck parts?
> A. Yes.
> Q. And pay duty on those respective parts?
> A. Yes.
>
> . . . .
>
> The Court: Can you tell me who gave [the instructions] to [Mr. Tullock]?
> The Witness: Almost certainly Lars Anderson.
>
> . . . .
>
> The Court: And do you know exactly what those instructions were, or do you just know in substance what you believe?
> The Witness: I know the substance of them, what they should have been.
> The Court: You don't know exactly what the instructions were?
> The Witness: I have not seen or written a piece of paper that – that would have conveyed this to Tullock.

Trial Tr. at 570-72.

[37] Although there is evidence Moody was "closely apprised" of Ford's FTSZ activities by Anderson, *see* Trial Tr. at 558-59, there is no evidence to indicate Moody had any reliable basis for knowing exactly what might have been communicated between Anderson and Tullock while the FTSZ was being established at the Louisville plant.

pertinent part:

> We must then establish a beginning inventory on the controlled parts with the assistance of customs personnel. At this time, all inventory on hand including all inventory released at port of entry will be considered PD material; that is, material on which all required duty has been paid. I will open entries on the NPF Master covering each part. Division Traffic will then have to notify carriers that subsequent receivals of controlled parts must travel under bond from port into our plant.

> As these subsequent receivals enter the subzone, I will pay duty @ $.033 and request immediate transfer from zone on controlled material to be used in Ranger production. As units are produced, I will pay duty @ $.026 on material used in Bronco production.

Pl.'s Ex. 62-1. Tullock's memorandum to Weingart states, in pertinent part, "Duty will be paid on such material for producing Rangers as it arrives in the zone—It will be paid on Bronco materials as they are produced." Pl.'s Ex. 64. At minimum, these memoranda indicate Tullock had an understanding of the correct duty rates and the correct timing of the payment for the rates for each vehicle. The memoranda, however, do not indicate Tullock received instruction on or had an understanding that truck parts should be given the designation of PD nor that car parts should be designated NPF.[38] Further, the memoranda do not indicate Tullock received instruction on or had an understanding of whether or when markings on CF 214s should be made nor when or how Tullock was to complete CF 7501s.

More importantly, however, although the memorandum to Kuchenbrod identifies seven

---

[38] Although Tullock's memorandum to Kuchenbrod mentions "PD material" and mentions that such material is that "on which all required duty has been paid," there is nothing in the memorandum which indicates any time payment is made when the parts enter the FTSZ, the parts should be given "privileged domestic" (PD) status. Consequently, the Court cannot infer from the language in this memorandum that Tullock understood that truck parts should be given PD status.

interchangeable parts to be controlled,[39] the memorandum does not indicate how the

interchangeable parts were to be divided between truck parts and car parts when the parts entered

the FTSZ. Kuchenbrod testified that if a part arriving at the plant were interchangeable between

cars and trucks, there would be no way to know at the time the part entered the FTSZ for which

vehicle that part was destined prior to production, and there was no separate section designated

for truck parts or car parts in the FTSZ. *See* Trial Tr. at 467-68. Moreover, although Ford

Headquarters identified how many trucks and cars were to be produced and that information was

downloaded at the Louisville plant,[40] for those parts which were interchangeable, it appears there

was no way to determine their destination when the parts entered the FTSZ until after the parts

were incorporated into the appropriate vehicles.[41] *See, e.g.*, Trial Tr. at 468-70.[42] The Court

_____

[39] Kuchenbrod testified that each of the parts listed on Pl.'s Ex. 62-2 were either engines or transmissions and that each appeared to be next to a designation for either a Bronco or a Ranger. *See* Trial Tr. at 474. Kuchenbrod confirmed that it appears at least these seven parts were interchangeable. *See* Trial Tr. at 471.

[40] Kuchenbrod testified, in relevant part:

> Q. Can you tell us how it was that it was determined whether a particular engine or transmission would go into a Ranger versus a Bronco?
> A. It was based on the production schedules. The production schedules were – were downloaded to us . . . I don't remember at that time whether it was in three-day buckets, we call them, or five-day buckets.
>      But whichever, it was downloaded to the plant from Detroit. Here is what you will get for the next three days or five days, whichever the case may be.
>      . . . So, at the beginning of the week when they downloaded this bucket of schedules that says you are going to build this many trucks, this many Broncos, this many Rangers, and here are the VIN numbers, here is the serial number, each truck was downloaded to be built was already – already had an identity and already had a bill of material how it was going to be built.

Trial Tr. at 454-55.

[41] The evidence suggests there were some engines and transmissions unique to either cars or trucks. *See* Trial Tr. at 536-37. Where the parts were unique to either cars or trucks, it

finds the instructions given to Kuchenbrod as to how many trucks or cars should come off the

production line each day was not tantamount to instructions to Tullock as to which engines or

---

appears Tullock would have been able to identify which parts would be destined for trucks and which for cars as Tullock was familiar with Ford parts numbers for engines and transmissions, as the only parts chaser at the Louisville plant chasing engines and transmissions. *See* Trial Tr. at 546-47. It is unclear, however, what percentage, if any, of controlled parts under the FTSZ were unique. *See* Trial Tr. at 536.

[42] Kuchenbrod testified, in relevant part:

> The Court: [W]hen you walk into the area where the materials are for the making of the vehicles, prior to going to the head of the production line, you wouldn't know whether or not this was a truck part or a car part?
> The Witness: No, Sir . . .
> The Court: Would Mr. Tullock have known and you not know?
> The Witness: No, Sir, he wouldn't.
>
> . . . .
>
> The Court: Why would nobody know?
> The Witness: Because you know you need 800 engines for today. We set 800 engines on the line. As the cars or the trucks, whatever, comes by, the operator that decks engines goes and gets one of them and puts them in that vehicle that calls for it.
> The Court: So, it is a great big group of 800 engines?
> The Witness: Yes.
> The Court: So –
> The Witness: And used, as required, as the jobs go down the line.
> The Court: And to the best of your knowledge, nobody keeps track of the difference between the truck engines and the car engines?
> The Witness: Not in the production area, no, sir.
> The Court: Do they keep track of them any other place that you know of?
> The Witness: The material could be retrieved after the fact, after the engine was installed and was married up to a vehicle identification number, after the fact. Yes, Sir.
> The Court: But –
> The Witness: Not before.
> The Court: Not before?
> The Witness: No, sir.

Trial Tr. at 468-70.

transmissions should be used for cars or trucks when the parts entered the FTSZ. Indeed, it appears to the Court, there were no instructions at all to Tullock as to when and how he was to declare the interchangeable parts for cars or trucks when they entered the FTSZ.

Moreover, it does not appear Tullock received instructions on how to handle the interchangeable parts as they arrived at the FTSZ through his on-site training. As part of Tullock's training, he met with other Ford FTSZ Coordinators and reviewed the paperwork to learn how to maintain an appropriate record keeping system. *See* Trial Tr. at 562-63. The other FTSZs which Tullock visited, however, did not, like the Louisville FTSZ, have interchangeable parts. *See* Trial Tr. at 619 and 621-22. Thus, it is clear Tullock did not receive adequate training or instruction on how to handle the interchangeable parts at the point they entered the FTSZ. Even if the Court were willing to infer that when the instructions were given, the instructions were binding, and Tullock had no discretion to deviate from them, *see* Trial Tr. at 578 and 581; Pl.'s Ex. 75 at 244, for this Court to conclude that Tullock received *complete instructions* and *training* on how to handle the imported engines and transmissions when they arrived at the Louisville FTSZ based on the evidence presented at trial is a leap this Court is simply unwilling to make.

Moreover, even if Tullock had received sufficient instructions and training, the record suggests Tullock was not adequately supervised and that lack of supervision may have contributed to his errors. According to the Federal Circuit in its opinion remanding this case for trial, "if negligent supervision was a contributing factor to Tullock's error, the error is not correctable under section 1520(c)(1)." *Ford II*, 157 F.3d at 863. First, there appears to be some

question regarding who was actually supervising Tullock.  Kuchenbrod testified he did not

supervise Tullock with respect to his customs-related duties as FTSZ Coordinator, and he

believed Moody and Anderson had adequately trained him and were available to answer his

questions.  S*ee* Trial Tr. at 460-61.  Anderson, however, testified that Kuchenbrod was Tullock's

supervisor.  *See* Defendant's Exhibit (Def.'s Ex.) N at 36-37.  Kuchenbrod, however, had not

been trained in the foreign trade zone activities, *see* Trial Tr. at 459, and knew almost nothing

about Tullock's FTSZ responsibilities.  *See, e.g.*, Trial Tr. at 460.  This lack of supervision,

Anderson suggests and this Court finds, appears to have had a direct impact on the ability of

Tullock to carry out his instructions.[43]

Second, those who were allegedly supervising and training Tullock on his FTSZ

activities, Anderson and Moody, apparently were not aware some of the parts to be controlled in

the Louisville FTSZ were interchangeable between trucks and cars.  *See* Trial Tr. at 612-15.

Moody specifically testified that "at the time we activated the [FTSZ in Louisville], I was not

aware if there were any [controlled common usage parts]."[44]  Trial Tr. at 612-13.  Anderson

---

[43]  For example, Anderson had instructed Tullock to create a "NPF Master" based on the number of control parts used in the Bronco IIs as reflected in the Transaction Register and a production report.  *See* Defendant's Exhibit (Def.'s Ex.) N at 48-49.  Anderson apparently explained to Tullock how to transfer information from the Transaction Register to the "NPF Master" by phone.  *See* Def.'s Ex. N at 52.  When realizing Tullock had erroneously filled out the "NPF Master"—a realization which first materialized on January 2, 1986, *see* Def.'s Ex. N at 81, and for which Tullock apparently still needed help as of February 18, 1986, *see id.* at 83—Anderson stated the reason there was a problem for such an extended period of time was "[b]ecause [Tullock] was working independently and his need for help hadn't been guided by anybody from the home office, so to speak."  Def.'s Ex. N at 83.

[44]  The Court notes nevertheless that a memorandum discussing a proposed inventory control system which was apparently prepared by Moody in July 1984 contemplated that articles of common usage, including engines and transmissions, would be employed at the Louisville

testified that, to the best of his knowledge, prior to his deposition testimony on July 27, 1994, he did not understand that there were commonality of usage of the same parts in trucks and cars at the Louisville FTSZ. *See* Def.'s Ex. N at 255[45]; *see also* Trial Tr. at 618 (Moody "presuming" Anderson was not aware there were interchangeable parts at the Louisville FTSZ). Moreover, Tullock testified Anderson did not assist him in trying to set up a paperwork system in Louisville differently from the FTSZs he had visited to extrapolate what the other zones had been doing to what he was expected to do at Louisville. *See* Trial Tr. at 705. Thus, as Tullock's "supervisors" for his work as FTSZ Coordinator did not know there were interchangeable controlled parts at the Louisville FTSZ, Tullock could not have been adequately supervised on how to designate those parts and account for them upon their entrance into the FTSZ. Notwithstanding Ford's arguments, this Court finds it was Ford's duty to file accurately the entries, timely pay the duties, and accurately claim PD or NPF status on the appropriate parts. Ford is a sophisticated corporation that reasonably could be expected to prepare entry documents with accuracy.

---

FTSZ. This proposed inventory control system was rejected by Customs. *See* Trial Tr. at 644.

[45] Anderson specifically testified:

> Q. Prior to [the deposition on July 27, 1994], . . . was it not your understanding that there was no commonality of usage of the same part in a truck and automobile in the Louisville plant?
> A. That's right. Yeah.
>
> . . . .
>
> Q. To the best of your knowledge and recollection, is it your – was that your understanding back in the period from 1985 to 1987?
> A. Yes. I would say that's true.

Def.'s Ex. N at 255.

IV. CONCLUSION

For the reasons stated above, this Court finds Ford has not put forth sufficient evidence to satisfy its burden of showing, pursuant to *St. Paul*, 6 F.3d at 768, that it was unreasonable for Customs to extend liquidation on the premise that information needed for the proper appraisement or classification of the merchandise was not available to the appropriate customs officer and that the fraud investigation was not reasonably expected to produce information about appraisement or classification. Additionally, this Court finds Ford has not put forth sufficient evidence to satisfy its burden of showing the length of Customs's extensions was unreasonable. Thus, this Court rejects Ford's contention Customs had no legal basis for extending liquidation and holds Customs did not abuse its discretion in extending liquidation on three separate occasions pursuant to 19 U.S.C. § 1504(b)(1). Additionally, this Court finds Ford has failed to prove Tullock committed correctable clerical errors and, therefore, holds 19 U.S.C. § 1520(c)(1) offers no relief to Ford in this case. Accordingly, this action is dismissed.

_____
Gregory W. Carman, Chief Judge

Dated: August 21, 2000
      New York, New York

**ERRATA**

Ford Motor Company v. United States, Court No. 92-03-00164, Slip-Op. 00-103, dated August 21, 2000.

On p. 12, line 10, delete the word "for" between the words "leave" and "in."

August 28, 2000.